The Western and Atlantic Railroad Company *v.* Bussey *et al.*, by next friend.

1. Where, under the provisions of section 3893 *et seq.* of the code, depositions of a witness are taken for use in a cause then pending, at the trial of such cause the depositions so taken may, in the discretion of the court, be read in evidence notwithstanding the presence of the witness at the trial.

2. Rules prescribed by railroad companies for the government and direction of their employees in the discharge of their duties, and for the non-observance of which an employee forfeits a right of recovery which otherwise would accrue to him, are to be strictly construed against the company, and will not by implication be extended beyond their clear and obvious meaning.

3. Although a rule of the defendant railroad company prohibited the running of its trains above a certain rate of speed at a given switch point, it was not error to refuse a request to charge that it was the duty of the engineer to "slacken" the speed of the train at such point; the request leaving out of consideration the

rate of speed at which the train in question was actually being run at such given point at the time the collision occurred which resulted in the injury complained of.

4. Notwithstanding a rule of the defendant company requiring all trains to stop at *schedule* meeting and passing points, the court did not err in refusing a request to charge that it was the duty of the engineer to stop his train at the point where the collision occurred, it not appearing that the same was either a schedule meeting or passing point. Nor did the court err in charging the jury that the engineer under such rule could pass other than schedule meeting and passing points " at such rate of speed as common prudence dictated as safe."

5. Where a rule of the company enjoined upon a coemployee of the plaintiff the performance of a particular duty, such coemployee was bound to exercise ordinary care in the discharge of that duty ; and it is not cause for reversal that the court charged the jury, that if such coemployee failed to exercise ordinary care in discharging such duty, they " ought to find the defendant company negligent in that regard."

6. A special bulletin order regulating the speed of trains when passing certain particular switch points designated therein, has no application to switch points generally; and in the absence of evidence showing that the point at which the disaster occurred was of the particular class of switch points embraced within the terms of such order, the court did not err in charging the jury that this order could have no application to the point in question.

7. Where a special order of the company prohibited the running of trains at a greater rate of speed than twenty miles per hour at a given switch point, the court did not err in charging the jury as follows: " If [the engineer] was not running faster than twenty miles per hour when he passed the switch, you ought to find that he did not violate the bulletin order mentioned, even though he ran faster than that at a point further back on the track."

8. Where a rule of the company prohibited generally the use of intoxicating liquors by its officers and employees, the use thereof by an employee who sues for personal injuries would not defeat a recovery, unless such use contributed in some appreciable degree to producing the injury sustained. That the violation of such rule might have done so, if it did not in fact so contribute, would not defeat a recovery. The court therefore properly charged the jury, "that if such employee violated the rule in question, the presumption would arise that such violation contributed to produce the collision, and the burden of proof was on him to show that it did not so contribute, directly or indirectly."

9. The charge of the court upon the measure of damages and upon the rules for computing the same, was in the main correct; and that the trial judge omitted to inform the jury that in the annuity

table there were two columns, one designed for computing interest at six, and the other at seven per cent., is no cause for the reversal of a judgment refusing a new trial, it appearing that the amount of damages recovered is not at all excessive, and clearly within the sum to which the plaintiff would be entitled if computed under either rate per cent.

10. The charge of the court, as a whole, was full, fair, and, in all essential respects, free from error; the verdict, upon careful review of the evidence, is fully warranted, and, having been approved by the presiding judge, will not be disturbed.

December 4, 1894.

Action for damages.   Before Judge VAN EPPS.   City court of Atlanta.   July term, 1894.

PAYNE & TYE, for plaintiff in error.

SMITH & PENDLETON, *contra*.

ATKINSON, Justice.

Mrs. Bussey sued the defendant company for damages because of the homicide of her husband, alleged, in substance, to have been caused by the negligence of the agents of the defendant in turning one of its switches to a side-track upon which one of the trains of the company was standing, and in so leaving the switch as that when the train upon which her husband was the engineer was due arrived at that place, his engine took the side-track and collided with the train thereon; and because the defendant was further negligent in that, it being dark at the time of the collision, its servants gave no warning, by switch lights or otherwise, of the condition of the switch. The declaration further alleged that the engineer who was injured was free from fault. The original plaintiff having died pending the action, the present plaintiffs, who were the children of herself and her deceased husband, were made parties plaintiff by their next friend. Upon the trial of the case, many questions of fact and law arose which involved the interpretation and application of certain rules adopted by the railroad company for the government of its employees. The rules introduced were as follows, to wit:

" Rule 17.   All trains must stop at schedule meeting or passing points, unless the switches are plainly seen to be right and the track clear.   The point at which a train should stop is the switch to be used by the train to be met or passed in, going in on the siding.

" Rule 23.   Passenger-trains will not exceed thirty-five, nor freight-trains twenty miles per hour.

" Rule 35.   All trains will run with great care after rains, and' slacken their speed when the track is in bad order, while passing switches and when crossing long bridges and trestle-work, and, when practicable, shut off steam.

" Rule 41.   Conductors have entire charge and control of their trains and all persons employed on them, and will be held responsible for the movements of their trains while on the road, except when their directions conflict with the rules, or involve risks or hazards, in either of which cases the engineer will be held alike accountable. Copies of special orders concerning the movement of a train will be furnished to both engineer and conductor, and where such orders are telegraphed, both engineer and conductor must reply by a signal message to the officer by whom the order was issued, stating how they understand the order, and must not leave the station at which it was received until notified by the proper officer that the order is correctly understood.

"Rule 46.   Conductors and enginemen will consult the bulletin board daily and note all new orders.

"Rule 90.   The use of spirituous liquors, profane swearing, obscene language, boistering, swaggering or other conduct unbecoming a gentleman will not be tolerated in the employees of this road, either on trains, at stations, eating-houses or elsewhere.   Rudeness or incivility to passengers or other patrons of the road will in all cases meet with immediate punishment.

"Rule 95.   Conductors and enginemen will be held equally responsible for the violation of any of the rules governing the safety of trains, and they must take every precaution for the protection of their trains, even if not provided for by the rules.

"Rule 96.   Run no risk; take the safe side in case of doubt.

· " *Special Instructions.*—Rule 4.   The use of intoxicat-

ing liquors is forbidden to the officers and men engaged in the service of the W. & A. R. R. Any one who becomes intoxicated will be dismissed.

"Rule 5. Run no risk; take the safe side in case of doubt."

There was a verdict for the plaintiffs for six thousand dollars, and defendant's motion for a new trial having been denied, it excepted. The motion was upon the general grounds, upon the ground that the verdict was excessive, and upon the special grounds with which we now proceed to deal.

1. It appears that upon the trial of the case, plaintiffs' counsel offered to read in evidence the depositions of one Earwood, a witness for the plaintiffs, the depositions of this witness having been taken before a commissioner under section 3893 *et seq.* of the code. At the time the plaintiffs offered to read the depositions in evidence, it appeared that the witness was himself present in court; and thereupon the defendant objected to the depositions being read, and insisted that the witness should be put on the stand and examined orally. The court overruled the objection and allowed them to be read. It is urged upon us with great earnestness by counsel for the plaintiff in error, that these depositions should have been excluded, and that the analogy of decisions rendered in this court in which the answers to interrogatories taken were excluded when the witness was himself present at the trial should be applied to the class of depositions now under consideration. The ground upon which answers to interrogatories, under such circumstances, are excluded, is that such answers are in their nature but secondary evidence. They are allowed under certain circumstances *ex necessitate rei,* and not because testimony of that character is favored of the law. The allowance of that class of testimony is justified under the statute, upon the supposition that

the witness is either personally unable to attend upon the trial because of physical infirmity, or because the necessity of his personal attendance would withdraw him temporarily from the performance of some public duty, and upon other like grounds mentioned in the statute; and therefore, his presence was dispensed with and the answers to interrogatories allowed in lieu of an oral examination. The taking of depositions, however, under section 3893 *et seq.* of the code, does not proceed upon that idea. It is not an *ex parte* proceeding. It is primarily for the convenience of witnesses themselves, and to relieve them of the necessity of attending upon trials upon original writs of *subpœna*, which, in the absence of such provisions, would issue as a matter of course, upon the application of either party, to any resident witness. In the large commercial centers, the courts are almost constantly in session, and to require the personal attendance of witnesses during the trials to which they have been subpœnaed, would involve them in great pecuniary loss and involve a sacrifice of their personal interests without any corresponding personal advantage. It is, therefore, that in counties containing as many as twenty thousand inhabitants, the legislature has wisely provided that at the election of either party any witness might be examined by a commissioner appointed by the presiding judge. When this commissioner sits, he is clothed with a species of judicial character. The witness may be orally examined by the party calling him and cross-examined by the adversary, and the entire result of the examination is required to be reported to the court; the court at last judging of the competency of the witness and the legality of his testimony. So that in civil cases, the very difficulty suggested by counsel in argument, that a defendant is not himself confronted with witnesses that testify against him, is obviated. There is no constitutional re-

quirement of that character in that class of cases. It
is a subject with which the legislature, in its discretion,
has full power to deal; and indeed it might, if it saw
proper, expressly deny a writ of *subpœna* to any witness
who had been thus examined. To say then that the
casual presence of such a witness in the court-house at
the time the case happened to be tried would have the
effect to render nugatory the previous proceeding to
take his testimony, would be to deny to him the very
privilege the legislature designed to confer upon him.
The proceeding to take testimony in this class of cases,
under the conditions provided by this act, bears a strik-
ing resemblance to the methods of procedure where a
case is referred to a master in chancery or an auditor
at law.    In the latter two cases, the evidence together
with the findings of the master and auditor are required
to be reported, and in the proceeding now under consid-
eration only the evidence of the witness is required to
be reported; its weight to be determined by the court
after it is received. It would not be contended for a
moment, that the presence of a witness at the time a
master's report or auditor's report is submitted to the
court would deprive the evidence of such witness em-
braced in the report of its quality as legal testimony;
and we see no greater reason in case of depositions than
in the other cases just referred to, why the testimony
should be excluded because the witness happened to be
present. He was not required to be present; and while
we do not mean to say that circumstances may not arise
under which the trial judge, in the exercise of a sound
discretion, might require a witness to appear and testify
in person, even though his depositions had been taken,
we know of no rule resting upon positive statute, or
which could be evolved from the legislative scheme ex-
pressed in the provisions of the code now under consid-
eration, which would constrain an exclusion of such dep-

ositions upon the mere suggestion that the witness was present. Two methods of examination were open to this plaintiff in the first instance: one by depositions taken before a commissioner, the other by oral examination in the presence of the court. He elected to adopt the former, and cannot be deprived of the benefit of his election by the voluntary appearance of the witness. Upon proper cause shown, the court, in the exercise of its discretion, upon the application of the plaintiff, might relieve him from the effect of his election; but if he is willing to abide by it, the defendant cannot be heard to say that the testimony thus taken is illegal. If there are other facts within the knowledge of the witness, material to his defense, the defendant is at liberty to examine the witness orally upon his own motion. We do not think, therefore, that the court committed an error of law in refusing to suppress the depositions, or in admitting them to be read before the jury.

2. Many of the questions made in this case turn upon the interpretation of rules made by the railroad company for the government of its employees, and for their direction in the discharge of their duties. And this circumstance induces us to indulge in some general observations upon the legislative power of corporations with respect to their employees, and the obligation which they assume toward the employee when they enter upon the exercise of that power. The general law of master and servant enjoins upon the servant the duty of a faithful allegiance to the interests of his employer, and the duty to exercise in all cases at least ordinary care in the discharge of his duties; but the statutes of this State extend this principle to the point of enjoining upon an employee of a railroad company, who sues for injuries resulting from the negligence of a coemployee, the duty of so controlling his own movements as to be himself absolutely free from fault. When the corpo-

ration itself enters upon the task of framing rules which shall stand as law unto its employees, the lawmaking power should be reasonable in framing such rules, and should express them in such language and so directly as to be entirely unequivocal. If by the formulation of rules it undertakes to meet the varying exigencies which may arise in the conduct of its business, substituting direction to him, for a discretion which otherwise the employee would be required to exercise and for the exercise of which he would be answerable, their statutes must be at least unequivocal and within the comprehension of the class of persons upon whom they are designed to operate. Nothing should be left to intendment. It should be borne in mind that the persons ordinarily employed in the conduct of this business, and for the government of whom these rules are designed, are not learned or skilled in the technical rules of statutory interpretation; and therefore if they be not couched in such terms as to make them intelligible to employees, or if they be so far equivocal as to express one thing and mean another, it would be a harsh rule of law which would hold the employee answerable where he conformed to the express direction of the master, but in doing so violated what the latter may be pleased to term the spirit of a rule. Such rules are to be strictly construed against the company, and will not be held to enjoin upon an employee a particular duty with respect to a particular subject, unless such duty be comprehended within the clear and obvious meaning of the rule itself. That forfeitures are abhorred in equity and are never favored in law, is an old maxim of universal acceptance in the courts of this State. Therefore such rules ought not to be held to forfeit the right of an employee to recover, where otherwise under the law he would be entitled to recover, unless there has been a plain and manifestly negligent violation of the rule according to its plain and

obvious meaning; nor unless such violation of the rule has been itself a contributing cause to the injury.

3. Complaint is made that the court erred in refusing to charge the jury, at the request of the defendant's counsel, as follows: "If you believe from the evidence that Mr. Bussey, the engineer in charge of the train, violated a rule of the defendant which was in force and effect at the time of the accident, of which Mr. Bussey had knowledge, which provided that while passing switches the speed of the train should be slackened, and this collision was occasioned in whole, or at least in large part, from his not observing this rule, and that from such collision Bussey received injuries from which he subsequently died, the plaintiffs cannot recover, although the defendant may have been negligent in not having the switches properly set." This request, it will be observed, was directed to the performance of a particular duty imposed by a special rule of the railroad company; and the request assumes the duty to have been to slacken the speed of the train while passing switches. This request was properly refused, we think, for the reason that there was no evidence in the record to justify the instruction therein contained. The only rule of the company in which we find the expression "slacken the speed" employed at all is rule 35, which was introduced in evidence, and which provides that "All trains will run with great care after rains, and slacken their speed when the track is in bad order, while passing switches and when crossing long bridges and trestle-work, and, when practicable, shut off steam." There was no evidence submitted, so far as we have been able to gather from the record, that there had been recent rains or that the track of the railroad company was in bad order; indeed, the contrary of the latter condition seems to be established by the evidence in the case. Inasmuch, therefore, as by this rule the engineer was only

v 95-38

required to slacken speed while passing switches when the track was in bad order, there was no evidence which would authorize the giving of a request based upon such a predicate. Besides, according to another rule of the company, even at switch points, engineers were authorized to run their passenger-trains at a rate not to exceed thirty-five miles and freight-trains at a rate not to exceed twenty miles per hour. It is contended, however, that this general rule was qualified by what is termed a special bulletin relating to the same subject, and providing that during the time the railroad authorities were occupied in putting in a certain class of switches, the speed of freight-trains passing switches was limited to ten miles and passenger-trains to twenty miles per hour. This special bulletin was not itself introduced in evidence. It appeared that it had been lost or destroyed. No copy was preserved, and it was necessary to rely upon parol evidence as to what were its contents. It is difficult to arrive at its exact terms; and according to the testimony of the superintendent, who, among other things in testifying in regard to the bulletin, said: "I do not suppose there was any special bulletin about that switch at the time Mr. Bussey was hurt, because they had left that switch and were working beyond," it was exceedingly doubtful, even if the terms of such bulletin were accurately remembered by the witness, whether at the time of the injury it was of force. As enjoining then a special duty outside of the general rule, this bulletin was insufficient of itself to require a slackening of the speed. According to the testimony of the superintendent, it was only provided by this bulletin that passenger-trains should not pass over its switches at a greater rate than twenty miles. Up to that rate the engineer was within the bulletin; and inasmuch as it did not enjoin upon him a specific duty to slacken the speed, the request was inapplicable. So that, under

these rules, including the bulletin, if the engineer were running within this rate, and the jury so found, the instruction asked would have been misleading, because, even though the condition of the track was such as to authorize him to run upon the prescribed rate, and he were running at a less rate even than this, unless he in fact slackened his speed, he would be guilty of negligence. In other words, though the rules of the road allowed him to run at thirty-five miles or twenty miles per hour, if he was in fact running at only three miles per hour, and yet did not at this point slacken his speed, under the instruction asked, he could not recover. The evidence was conflicting as to the speed at which the train was running; but this request, as it did, leaving out of consideration entirely the rate at which the train was actually being run at the time the collision occurred, enjoined upon the engineer the duty to slacken, when no such duty might have been dictated by the rules of common prudence and was not enjoined by the rules of the company.

4. Complaint is also made of the refusal of the court to give in charge a written request which was in the following language: " If you believe from the evidence that the defendant had a rule of force at the time of the accident, of which Mr. Bussey had knowledge, that required all trains to stop at schedule meeting or passing points, unless the switches are plainly seen to be right and the track clear, I charge you that if the engineer, Mr. Bussey, knew of a train being on the side-track before getting to the switch and that he had to pass this train, although Kingston may not have been on the time-card as a schedule meeting or passing point, yet he would be bound by this rule when he discovered that he was to pass a train at that point." This request involves the trial of the issue raised by it, according to law made by the defendant company for the government

of the engineer; and in determining whether it was a
proper request, we must look to the rule established by
the railroad company, to ascertain whether the particu-
lar acts stated in the request were enjoined upon the
engineer by this rule.   The rule upon which it was pred-
icated is as follows : "All trains must stop at schedule
meeting or passing points, unless the switches are plainly
seen to be right.   The point at which a train should
stop is the switch to be used by the train to be met or
passed in going in on the siding."   The record in this
case shows that the passenger-train of which the de-
ceased husband was the engineer was bound southward.
The freight-train with which he came in collision was
bound northward.   At the place where the collision oc-
curred, there is a side-track with two openings, one at
the north end, the other at the south.   The freight-train
in going north would enter the side-track at the switch
situated at the south end of the side-track.   This then
was the point of danger.   This then was the point at
which the train going south was required by the rule to
stop.   The collision occurred in consequence of the
northern switch being left open, and at a point near the
north end of the side-track.   So it will be observed that
the point of danger at which, by the rules of the com-
pany, the engineer was required to stop his train was
at one point, and the point of actual danger, as devel-
oped by the facts of this case, was at another point.
According to the testimony, the collision occurred be-
fore the engineer ever reached the point where the rule
of the company enjoined upon him the special duty to
stop his train.   Aside from this, there was no evidence
that the point at which the collision actually occurred
was a schedule meeting or passing point within the
meaning of that rule.   So that the court committed no
error in refusing this request.   Nor was there any error
in the charge by the court, that the engineer under such

a rule could pass other than schedule meeting or passing points at such rate of speed as common prudence dictated as safe.

5. Exception is taken to the following charge of the court : " If you believe from the evidence that a brakeman of the defendant was under a duty to set the north switch, as it is called in the evidence, so as to make the main track secure for the passage of the engine that Mr. Bussey was driving, and he failed to use ordinary care in discharging this duty, and so did not set the switch and lock it to the main track, but set it and locked it to the side-track so as to cause the engine to leave the rail at that point, you ought to find that the company was negligent in that regard." It is insisted that this charge of the court is erroneous, in that it stated to the jury as a conclusion of law that certain facts, if proven, would constitute negligence; and that negligence is a question of fact which the jury are to judge from the evidence, and not a question of law, and it is not the province of the court to tell the jury that any given state of facts amounts to negligence. We think the rule of law as stated in the exception to this charge is a perfectly sound one, and the exception might be sustained, but for the fact that it has no application to the particular charge complained of. It will be observed that the court did not say that if the jury found from the evidence that the defendant's employee omitted to perform certain duties, such omission would amount to negligence upon his part; but the charge of the court is, that if the jury found that if a certain duty was enjoined upon this special employee and in the performance of that duty he failed to use *ordinary care,* and in consequence of his failure to use such ordinary care he so set the switch as to produce the injury, they ought to find the company was negligent in that regard. The failure to exercise ordinary care in discharging the duty was

negligence, and the charge of the court clearly submitted to the jury the questions, first, whether such a duty was imposed, and secondly, whether or not in the performance of the particular duty the employee exercised ordinary care. If they found that such a duty were imposed and that the employee did exercise ordinary care in its performance, then the company would not be negligent; if he did not, it was negligent.

6. It was in issue as to whether a certain bulletin order was issued regulating the speed of trains at switches, and whether, if such an order existed, it was a general order applicable to all switches. The charge of the court was, upon this subject: "If there was a bulletin order as to speed at switches, or bulletin orders on that subject, but this was not a general order applicable to all switches, but a special bulletin relating to particular switches undergoing repairs and mentioned in the face of the order, it would not apply to the switch in question, in the absence of evidence showing that this switch was specified." We think this was a correct interpretation of the order and a proper instruction to have been given to the jury. Certainly a special bulletin purporting to regulate the speed of trains when passing particular switches could have no application to switches generally; and even if such a bulletin existed, in the absence of evidence showing that the point at which the disaster occurred was comprehended within the class of switch points embraced by the terms of the order, it could have no application, and the court properly so directed the jury.

7. There was much conflict of testimony as to the rate of speed at which the train was running at the time the collision occurred; and in arriving at the probable speed at which it was running, evidence was introduced as to the rate of speed it had run at other points before reaching the point at which the collision occurred. The

real question at issue, however, was as to the actual speed at which the train was running at the time of the collision. This was largely and necessarily to a great extent a matter of conjecture. None of the witnesses, even those who were most expert, could do more than express an opinion as to the rate of speed. This was one of the closely contested questions in the case. Upon that the trial judge charged the jury that: "If Mr. Bussey was not running faster than twenty miles per hour when he passed the switch, you ought to find that he did not violate the bulletin order mentioned, even though he ran faster than that at a point further back on the track." We think this was a proper instruction; that it was justified by the evidence, and was a proper precaution to the jury that, though the engineer were negligent in running his train at too high a rate of speed at other points, if at the time of the collision he was not exceeding the limit allowed by the bulletin order, assuming even that its existence and applicability to this particular switch point were properly proven, then he would not be negligent.

8. Exception was further taken to the charge of the court upon the subject of the use by an employee of intoxicating liquors. The portion of the charge excepted to is as follows: "If he violated a rule as to drinking spirituous liquors while on duty, such as that mentioned in rule 90, if the plaintiffs have shown to your satisfaction by clear and convincing evidence that his disobedience did not contribute directly or indirectly to occasioning the collision, you could not find Mr. Bussey guilty of contributory negligence as to that matter, in the legal sense. But if the evidence does not so satisfy you, the presumption would be, if Mr. Bussey drank spirituous liquors on his engine, that it did contribute; and you ought, under these circumstances, to find in accordance with the presumption and that the plaintiffs

cannot recover." Two rules of the railroad company
bearing upon this subject were introduced in evidence.
One was rule 90 and the other was rule 4. The former
provided as follows : " The use of spirituous liquors,
profane swearing, obscene language, boistering, swag-
gering or other conduct unbecoming a gentleman will
not be tolerated in the employees of this road, either on
trains, at stations, eating-houses or elsewhere. Rude-
ness or incivility to passengers or other patrons of the
road will in all cases meet with immediate punishment."
Rule 4 provides: " The use of intoxicating liquors is
forbidden to the officers and men engaged in the service
of the W. & A. R. R. Any one who becomes intoxi-
cated will be dismissed." As rules inculcating correct
moral principles and as tending to elevate the general
tone of morality and civility among its employees, these
were estimable provisions of police law. The use of
spirituous liquors by rule 90 was prohibited in the sense
of a legislative declaration that it will not be tolerated
in the employees of the road. In other words, for a
breach of these rules, employees are advised that the
company will police them, and if it be accompanied with
rudeness or incivility to passengers or other patrons of
the road, it will in all cases meet with immediate pun-
ishment. What the degree of that punishment shall
be, however, is left largely to the discretion of the
authorities of the road. There is no indication of a
purpose to insist, in case of accident, that the mere use
of intoxicating liquors shall amount to such negligence
as would forfeit to an injured employee a right of recov-
ery. Such could not have been the intention of the
framers of these rules, for the reason that if such con-
sequences were to be visited upon every employee who,
in a social way and wholly disconnected with the con-
duct of the business, took a drink of any kind of spirit-
uous liquors, then no employee who, at any time after

he came into the employment of the railroad company, took a drink of such liquors could ever recover for the wrongful act of a coemployee. The use of obscene language and profane swearing are classed with the use of spirituous liquors, but we are unable to see, however reprehensible might be the use of such language, how it could have the slightest possible bearing upon the question of negligence or diligence of an employee in the handling of an engine; and yet, judged by this rule, if it may be strictly construed (and we are not at liberty to construe it otherwise), the same consequences would be visited upon the man who was guilty of swaggering as if he had been addicted to the use of spirituous liquors. We think that rule 90, upon a close analysis, is designed rather to lay down a few elementary principles involving questions of ethics, than to prescribe rules for the regulation of the conduct of employees. Rule 4 deals more directly with the subject of the use of intoxicating liquors. It is declared there that " the use of intoxicating liquors is forbidden to the officers and men engaged in the service of the W. & A. R. R." The penalty attached to the use by the persons who framed the rule is contained in the concluding sentence, that " any one who becomes intoxicated will be dismissed." Now this rule is not confined to persons drinking while they are engaged in the conduct of their business. Under that rule, the president or general superintendent of the railroad company could not take a glass of wine upon a social occasion without exposing himself to the risk of instant dismissal. Railroad companies have no power to regulate the personal conduct of employees, save only in so far as the conduct of such employees may involve the proper discharge of their duties. It may be a good reason for the instant dismissal of an employee that he becomes intoxicated while on duty, or off duty. A railroad company has the right to say that

it will not employ, or retain in its employment, a man who is addicted to the use of intoxicating liquors. But when we come to deal with him upon the question of negligence in the performance of his duty, we deal with him upon higher ground than the artificial standard established by such rules. In a contest between the rule of a railroad company and the law of the land, the latter is supreme. The law of the State provides that if an employee be himself without negligence and is injured by the negligence of a coemployee, he is entitled to recover; and the railroad company cannot defeat a recovery by showing that he was guilty of some conduct at some time in violation of some of its rules, which did not involve the question of negligence and did not contribute, remotely or proximately, to the injury for which he brings his suit. As a matter of fact these rules introduced in evidence ought to have had no bearing upon the question in the case. It is the duty of the engineer of a railroad train, independently of all police rules established by the company itself, while in the discharge of his duties to abstain from the use of intoxicating liquors. The lives of the traveling public are committed to his care, and the interests of the public at large enjoin upon him the duty of being at all times in the full possession of all his faculties; and if, under such circumstances, he should drink intoxicating liquors, and in consequence thereof a casualty occurred resulting in injury to himself, a jury might find, even though there was no direct evidence showing primarily a fault upon his part, that in consequence of drinking the liquor he was likely to have grown less attentive to his duties, and therefore attribute to him some negligence which otherwise might not appear. But unless the use of such liquors did contribute in some appreciable degree to the production of the injury sustained, his right of recovery would not be defeated.

That it might have contributed to such result, if it did not in fact so contribute, would not defeat a recovery. If subject to criticism at all, the charge of the court upon this subject was much more favorable to the defendant than it was entitled to have. He charged the jury, with respect to these rules which we have been discussing, that if an employee violated a rule, the presumption would arise that such violation contributed to produce the collision. We think this is the only doubtful ruling in the whole case, and the doubt here is against the contention of the plaintiff in error. Why should the use of profane language by an engineer upon his train raise a presumption that it was a contributing cause, and attribute as a consequence the casualty to his negligence? Why should taking a single drink produce a similar result? And why should not this, as are all the other questions of fact made in the case, be decided according to the weight of the evidence, rather than with reference to supposed presumptions which arise? It is no presumption of law, and if it be one of fact, it should be, like other questions of fact involved in the case, decided by the jury. We do not desire to be understood as intimating that it is the purpose of this court by its rulings to relieve employees against the consequences of their own negligence; and particularly as to negligence resulting from intemperance. We recognize the danger to the public; we recognize the importance to the companies of the sobriety of their employees. But if the personal conduct of the employee did not amount to negligence contributing to the injury, this court cannot deny him the right to compensation.

9, 10. The questions of fact made in the record were submitted to the jury in one of the ablest, most comprehensive and most conservative charges it has ever been our good fortune to find in a record. It may said to be a model of its kind; and we are fully persuaded that

the verdict of the jury was carefully reviewed by this painstaking judge before the motion for a new trial was overruled. Notwithstanding this, however, we have been at great pains carefully to analyze the evidence contained in this voluminous record, and we find that upon all of the contentions between the respective parties the preponderance of the evidence is in harmony with the finding of the jury. That the father of these plaintiffs was killed in this collision, and that the collision was brought about without negligence upon his part and because of the negligence of other servants of the company, we do not think is open to serious question. The verdict is reasonable. If there were any errors committed by the trial judge in his instructions to the jury touching the application of the mortality and annuity tables which were in evidence, such errors are without doubt cured by the moderate finding of the jury. There having been then no error of law committed upon the trial, and the verdict being in harmony with the weight of the evidence, the discretion of the trial judge in refusing to grant a new trial will not be disturbed.        *Judgment affirmed.*

---

MARIL *v.* THE CONNECTICUT FIRE INSURANCE COMPANY.

1. Upon a policy of insurance which covers a stock of material used in a particular business, and which contains a printed condition prohibiting the keeping and use of certain inflammable substances upon the premises in which such business is conducted, a recovery may be had in case of loss, even though it should appear that such inflammable substances were in fact kept and used upon the premises, provided it shall further appear that the business in the conduct of which the stock of material insured was used is of such a character as that the use of such inflammable substances is a necessary, usual and customary incident to said business, and that such substances were kept only in such quantities and used only in such manner as, in view of the subject of the insurance, must have been in contemplation of the parties at the time the policy was issued.

2. If the business in question be of such a character as that some of the inflammable substances, against the keeping of which provision is made in the printed conditions of the policy, themselves constitute component parts of the stock of material used in such business, the policy would cover such inflammable substances and a recovery could be had for loss thereof, notwithstanding the printed condition against the keeping of such inflammable substances.

3. If in the stating clause of a policy of insurance the thing insured be described in general terms as a stock of "watchmaker's materials," and there be nothing in the policy itself indicating with exactness what articles were embraced in and intended to be covered by such general terms, parol evidence is admissible to explain the ambiguity, and to apply the policy to the subject of the insurance.

February 18, 1895.

Action on fire policy.    Before Judge MacDONELL. City court of Savannah.    February term, 1894.

The policy was written upon " watches, jewelry, diamonds, silver and plated ware, clocks, musical instruments, fancy goods, brick-a-brack, and other merchandise usual to a jewelry stock in and out of safes," and "watchmaker's material; all while contained in the three-story brick, metal-roofed building situated at number 24 Barnard street, in Savannah, Ga." The policy on its face provides that it shall be void "if the risk be increased by any means within the control of the assured, . . or if . . benzine, gasoline, petroleum or crude earth or coal oils are kept or used on the premises without written consent." There is this further clause in the policy: "Kerosene oil, if of the legal standard, may be used for lights; lamps to be filled by daylight only; one barrel may be kept on the premises for this purpose; and may also be kept for sale in stores, in quantities not exceeding five barrels at any one time; if kept in greater quantities, without written consent, this policy shall be void."

The plaintiff's testimony was: On the 7th day of June, 1892, a fire occurred on the premises covered by this

policy. The value of my stock was at that time $9,200. I was engaged in the jewelry business. $4,500 of this stock was in my safe. An appraisement was made on the stock, which appraisement placed the damage at $3,440. I have never been paid that amount, or any part of it. The loss on my stock by the fire was $3,440. I am twenty-six years old. I have been in Savannah ten years in November next. I was born in Russia, lived there until I was fourteen years old, when I went to New York, where I lived two years, since which time I have lived in Savannah. The fire occurred between three and four o'clock in the morning, and started on the north side of the store. Mr. Sack, my watchmaker, had the key to the shop. He did my repairing, in consideration of which I allowed him bench room. I do not know the cause of the fire, and have no idea what caused it. It looked as if the fire started under the counter; there was paper there. The fixtures were burned up; they were a total loss. A good deal of the stock could not be used. The fixtures were of wood. The walls and sides were badly charred. I do not know whether it looked like a flash fire or not, and to this day I have no theory as to how the fire started. The store was lighted by gas. I never kept kerosene oil, or benzine or naphtha for sale. None of these belong to a jewelry stock. I had a demijohn with kerosene oil in it. I do not know how big it was; it may have been a 3-gallon demijohn, but my opinion is that it was not less than 2 nor more than 3. Six or eight weeks before the fire I bought kerosene; I cannot tell the exact date. The kerosene in this demijohn was bought and used for the purpose of cleaning clocks. · I never used it myself; I am not a watchmaker. I had it there for that purpose. I am positive it was used for cleaning clock movements, and maybe, if the movements were rusty, it was used for watches too. It was

my oil but Mr. Sack used it; I saw him use it for clean-
ing clock movements.   After he would use it, he would
pour it back in the demijohn.   I looked at the demijohn
the morning after the fire.   I testified at the former
trial that it looked as if this demijohn had as much
kerosene in it after the fire as it had before the fire.
There must have been two quarts or a half-gallon in it.
I do not know how much was in it before the fire.   I
presume there was the same amount in it after the fire
as there was before.   After the fire I did not see any
cork.   I swore on the last trial that it was uncorked,
and my memory was fresher then than it is now; I was
probably right then.   The demijohn was sitting on a
shelf in the rear of the store, on the south side.   It was
in a safe place.   It had been sitting there for three
months and had never fallen off.   That was the place
we always kept it.   On this occasion there was one lamp
that had oil in it that I know of.   That was a student
lamp Mr. Sack used.   It was on the bench and fell off,
I presume.   Kerosene was used in it.   Then there was
a piano lamp.   It was one that I had sold and it was
brought back; it had some oil in it.   It was a large
lamp, I presume, which would hold a quart.   It was not
nearly half full, but there was some kerosene in it.
There was about a pint or a little more of benzine on
hand.   It was in a bottle that might hold a quart.   I
saw one can of oil on hand.   There were two cans there;
one had very little in it, and the other was about full.
I had no turpentine there.   On the morning after the
fire the insurance gentlemen and the firemen showed
me some paper which they said was saturated with tur-
pentine.   I do not know whether it was or not.   I
do not know whether the paper was wet with kero-
sene or benzine; maybe it was water; maybe there was
some kerosene on the paper; I do not know.   I do not
know how kerosene got there if it was there.   Maybe I

said at the time that I did not know how it got there. On January 1, 1892, in making my tax returns I swore that the market value of my stock was $1,800. Mr. Sack used the student lamp on his bench for night work. The benzine and kerosene that were there were used for cleaning purposes, cleaning the movements of clocks and watches. Benzine is used for cleaning watches. The amount of kerosene purchased was 10 cents worth. The benzine was kept near Mr. Sack's bench; I had nothing whatever to do with it. It was kept in a glass bottle. The benzine had nothing whatever to do with the fire, as far as I could see. The kerosene can that was full or nearly full would hold about two or three quarts. That kerosene was used by Mr. Sack, and was kept near Mr. Sack's bench on his side. He used it to put it in his lamp; maybe he used it for cleaning purposes too. The fire did not start near that can of kerosene. The other kerosene can was one that Mr. Sack said leaked, and we did not use it much. If there was kerosene on the paper there, I presume that the lamp must have turned over and some kerosene reached the paper. The piano lamp was turned over. At the time I made my tax return I owed about $5,000. I did not think that I should pay taxes on my debts. My idea was to deduct the amount of purchase money, and the balance represented what was liable for taxes. I counted that $9,200 less $5,000 would make $1,800. I simply owed the money but owned the stock. The lamp that was upset was on the same side the paper was lying on, the north side. The paper was not right at the lamp; the oil might have spread there. The paper was under the shelving, and the lamp was on the other side of the shelving. I do not know what quality of kerosene was in the demijohn. I just sent out and got 10 cents worth of kerosene; this oil was in the demijohn. I got it for cleaning purposes. The can which Mr. Sack used for his lamp, maybe, was a gallon can.