842.   GEORGIA, FLORIDA AND ALABAMA RAILWAY
            COMPANY *v.* SASSER.

1. If the judge of a city court is disqualified, any other city-court judge may preside in his stead.
2. In applications for continuance on the ground of surprise occasioned by an amendment made by the opposite party to his pleadings. the moving party or his counsel should state how and wherein he is less prepared to go on with the trial. Continuances on this ground are addressed to the sound legal discretion of the trial judge.
3. Where, in a suit by or in right of a railway employee against the company for personal injuries received through the negligence of fellow-servants, the defendant sets up that the employee was at fault in that he was in disobedience of the rules of the company and also of the instructions of his superior officer, and to sustain this defense the rules and instructions are put in evidence, it is the duty of the jury to compare the conduct of the employee with the rules and instructions, and, if it appears that a violation of either the rules or the instructions, properly interpreted, was a material contributing cause of the injury, they should find for the defendant. However, rules or instructions which are ambiguous, or which, by reason of their generality of statement, admit of more than one interpretation in practical application to a given state of facts, are to be construed most strongly against the company, and in favor of the employee's blamelessness.
4. The charge of the trial judge to the jury in the present case, on the method of construing and applying the rules of the company, was not erroneous.
5. Where it is sought to impeach a witness by proof of unsworn statements contradictory to his testimony given on the trial, foundation for the impeachment must first be laid by directing the attention of the witness to the alleged contradictory statements, with the particularity prescribed by the Civil Code, §5292. The inaccessibility of the witness at the time it is sought to lay this foundation does not justify a departure from the rule.
6. In the light of the state of the pleadings and the evidence, the failure of the judge to instruct the jury that if the deceased, by the exercise of ordinary care, could have avoided the effects of the defendant's negligence, the defendant would not be liable, was not error.
7. Under the statutes of the State of Florida, "Where the widow sues for damages for the death of her husband by the wrongful act of another, in estimating her pecuniary loss the jury may properly take into consideration her loss of the comfort, protection, and society of the husband, in the light of all the evidence in the case relating to the character, habits, and conduct of the husband as husband, and to the marital relations between the parties at the time of and prior to his death; and they may also consider his services in assisting her in the care of the family, if any; but the widow is not entitled to recover for her mental anxiety or distress over the death of her husband, nor for his mental or physical suffering from the injury. She is also entitled to recover

reasonable compensation for the loss of support which her husband was legally bound to give her, based upon his probable future earnings and other acquisitions, and the station or condition in society which he would probably have occupied, according to his past history in that respect, and his reasonable expectations in the future; his earnings and acquisitions to be estimated upon the basis of deceased's age, health, business capacity, habits, experience, energy, and his present and future prospects for business success at the time of his death,—all these elements to be based upon the probable joint lives of the widow and husband. She is also entitled to compensation for loss of whatever she might reasonably have expected to receive in the way of dower or legacies from her husband's estate, in case her life expectancy be greater than his. The sum total of all these elements to be reduced to a money value, and its present worth to be given as damages. Within these limits the jury exercises a reasonable discretion as to the amount to be awarded, based upon the facts in evidence, and the knowledge and experience possessed by them in relation to matters of common knowledge and information."

(a) The foregoing being the construction given the Florida statute by the Supreme Court of that State, it will be followed by the courts of this State.

(b) Where a statute of a sister State is pleaded and proved, the courts of this State will follow the construction adopted by the courts of that State, although no proof is made by the party that such a construction has been announced by those courts.

8. The method in which one party conducts his case in court is matter of legitimate comment by the opposing counsel in argument to the jury.

9. The judge has the discretion of allowing counsel to ask leading questions of his own witness.

10. The method of reducing expectant future damages to a present equivalent cash sum should be in accordance with the rule of the forum in which the damages are being estimated and assessed, even though the cause of action be based on a tort committed in another State.

11. No error of law appears. The verdict is large, but not excessive. It is warranted by the evidence.

Action for damages, from city court of Bainbridge—Judge Shipp presiding. October 26, 1907.

Argued January 21,—Decided April 20, 1908.

Rehearing denied May 1, 1908.

Mrs. Sasser sued the railway company for the wrongful death of her husband, who was an employee. The plaintiff's case rested on these facts, which in the light of the verdict we must take to be true: The deceased was a flagman on a freight-train, which on the day he met his death was proceeding south bound between Bainbridge, Georgia, and Tallahassee, Florida. At Havana, Florida, this train was overtaken by a passenger-train going in the same

direction. The freight-train contained about twenty cars, and was larger than any of the side-tracks at the station; it was therefore necessary, in order to let the passenger-train through, that the freight-train should go down the main line to a point below the southern switch, that the passenger-train should follow till it too had passed the switch and then back into the side-track, and, after this was done, that the freight-train should back up the main line till the way was clear. As the freight-train was thus backing northward (the engine being at the south end and the caboose at the north end), the deceased was standing inside the caboose, at a door cut in the rear end of it, watching the track in the direction in which the cars were being backed. Suddenly, violently, and unnecessarily, without signal or warning, the engineer threw on the air-brakes in full application; the resulting sudden stoppage and jerk of the train hurled the deceased headlong from the caboose to the track, and the cars ran upon him and killed him,—a casualty strikingly similar to that under review in the case of *A. & B. Air-Line Ry.* v. *McManus,* 1 *Ga. App.* 302 (58 S. E. 258). The plaintiff pleaded and proved a statute of the State in which the homicide occurred—Florida, entitling the widow to sue and to recover "such damages as [she] may have sustained by reason of the death of the party killed;" also §3150 of the General Statutes of that State, substantially in the language of §2323 of the Civil Code of this State (indeed an adoption of the Georgia law,— see F. C. & P. Ry. Co. *v.* Mooney, 40 Fla. 17, 24 So. 148), abolishing the defense of fellow-service in cases of railway employments. The defendant, in addition to denying that the application of the air-brakes was violent and unusual, set up that the deceased met his death through his own carelessness, that he was not where he ought to have been, was not at his post of duty, and was in a dangerous position when he easily could and prudently should have been in a place of safety. The jury found for the plaintiff $10,000. The defendant moved for a new trial, and to the refusal of it brings error. Exceptions pendente lite were preserved to certain rulings, and error is assigned upon them. The further facts necessary to an understanding of the points decided will appear from the opinion.

   *Donalson & Donalson, Pottle & Glessner, F. T. Meyers,* for plaintiff in error. *Russell & Hawes,* contra.

POWELL, J. (After stating the foregoing facts).

1. Judge Shipp of the city court of Moultrie presided at the trial in lieu of Judge Harrell of the city court of Bainbridge, the latter being disqualified. This was under the authority of the act of December 21, 1899 (Acts 1899, p. 48), which confers upon the judge of every constitutional city court jurisdiction to preside in another city court when the judge of the latter court is disqualified. The defendant made the point that this act is unconstitutional, and that the trial was therefore a nullity, for the lack of a legal judge. This point involved a constitutional question, and, as it stood at the threshold of the case, we certified it to the Supreme Court. That court has filed its instructions holding that the act is constitutional.

2. At the opening of the trial the plaintiff offered a slight amendment to the petition, for the purpose of avoiding the effect of certain special demurrers which had been filed. The court allowed the amendment. One of the attorneys for the defendant thereupon stated that he was surprised, and moved a continuance of the case. The judge stated that the court would pass the case till a later day during the term; this postponement the defendant declined. The court asked counsel to state specifically wherein he was surprised; but counsel chose to stand upon his previous general statement that he was surprised. "When any amendment shall be made to the pleadings or other proceedings in the cause, if the opposite party will make oath, or his counsel state in his place, that he is surprised by such amendment, and that he is less prepared for trial, and how, than he would have been if such amendment had not been made, and that such surprise is not claimed for the purpose of delay, the case may be continued in the discretion of the judge, and charged to the amending party." Civil Code, § 5128. From a perusal of the terms of the statute just quoted, it is palpable that there was no error in refusing a continuance under the circumstances. Indeed, after examining the amendment, we are satisfied that the surprise expressed was of that purely technical nature that does not admit of investigation under the probing of "how and why."

3. The defendant says that, irrespective of its negligence, the plaintiff should not have recovered, because the deceased was not without fault. The Florida law on the subject of injuries to rail-

way employees through the negligence of fellow-servants is the same as ours,—the injured servant must have been without fault, in order that he may recover; and the widow suing for his death has no higher rights in this respect than he would have had if he had survived the injury. Duval v. Hunt, 35 Fla. 85 (15 So. 876); F. C. & P. R. Co. v. Mooney, 40 Fla. 17, 45 Fla. 286 (24 So. 148, 33 So. 1010, 110 Am. St. R. 73); Morris v. F. C. & P. R. Co., 43 Fla. 10 (29 So. 541); Atlantic Coast Line R. Co. v. Ryland, 50 Fla. 190 (40 So. 24). It is contended that Sasser was out of his place of duty and was in disobedience to his superior officer, the conductor in charge of the train. As to this, it seems that when the freight-train was about to move down the main line to the southward, the conductor told Sasser to go back a sufficient distance to stop the approaching passenger-train and to inform the engineer thereon that the freight-train was on the main line and that he would have to back into the side-track; also to remain at the rear of the freight-train to protect the same while it was being backed past the other train, a sufficient distance to insure full protection. He went back and flagged the passenger-train, but, instead of staying back there, as the conductor says he intended he should, rode upon the pilot of that engine down to where the freight-train was, or rather to where the passenger-train left the main line for the side-track. "After he came in on engine No. 1" (the passenger engine), swears the conductor, "I instructed him to go back with the train [the freight-train, obviously] and to see that nothing was on the track—any obstructions or persons— and to remain there until called in." Being told this, Sasser walked from the conductor, waited for the caboose to come up, and got up inside it. It appears that he then went to the back of the caboose, and was standing in the door, when the application of the brakes caused him to be thrown out and killed. The company contends, and the conductor swears, that if Sasser had obeyed either of these instructions—the first in which he was told to go back and flag the passenger engine and to remain where he could protect the freight-train, or the subsequent direction on which he was told to go back with the train and to see that nothing was on the track—he would not have been hurt. If these instructions were ambiguous or equivocal, it was the right, if not the duty, of the jury to give the deceased the benefit of that construction which

was most favorable to him. *W. & A. R. Co.* v. *Bussey,* 95 *Ga.* 585, 592 (23 S. E. 207). As to the first instruction, it seems that Sasser obeyed it to the extent of going back a sufficient distance to flag the passenger-train. We must confess our inability to see how the language used is reasonably capable of the further meaning insisted on, that he was to remain up the track at the point where he met the passenger engine, until called in by signals from his own train; the necessity for his presence at that place was over, and, when he was riding on the pilot of engine No. 1, it seems that he was in position to insure his train the full protection commanded of him. The conductor then told him to go back with the freight-train and to keep a watchout for persons and obstructions on the track in the direction in which the train was backing. Obviously this meant that he should go back on the train, and not that he should walk or run back in advance of it, as the company contends; for, according to the proof, the train was moving faster than an ordinary man could have run. Especially, in the light of a rule of the company to which we shall presently refer, it meant that he should go to the rear of the train and keep a watchout from that point.

Rules of the company relating to the duties of flagmen were in evidence, as follows: "317. Flagmen will report to and receive instructions from the master of transit. When on duty they must obey the orders of the conductor. When in yards they must obey the orders of yard-master or station agent." "318. It is their especial duty to protect the rear of their trains in strict accordance with the rules, and they must allow nothing to interfere with the prompt and efficient discharge of this duty." "319. They must obey the signal from the engineman prescribed by the rules, but must never wait for such signal or for orders from the conductor when their trains need protection." "329. Flagmen of freight-trains must never leave the rear of their trains except to protect them, without permission from the conductor and the substitution of a competent man in their place." Also the following general rule governing the movement of trains was in evidence: "When cars are pushed by an engine (except when shifting and making up trains in yards) a flagman must take a conspicuous position on the front of the leading car, and signal the engineman in case of need."

. It is said by the defendant that this last rule required that the deceased should have been on top of the caboose, which at that time was the leading car, and not inside it. The language of the rule does not necessarily require this meaning, even if such a construction is at all reasonable. Rules which are ambiguous, or which, by reason of their generality, admit of more than one interpretation in practical application to a given state of facts, are to be construed most strongly against the master by whom they were promulgated.

4. In instructing the jury on the subject of rules promulgated by the master for the guidance of the servant, the court used the following language, to which exception is taken: "In considering the rules of the company which have been introduced in evidence, you are instructed that such rules are to be strictly construed against the company, and will not be held to enjoin upon an employee a particular duty with respect to a particular subject, unless such duty be comprehended within the clear and obvious meaning of the rule itself. The violation of a rule by an employee will not forfeit his right to recover, unless there has been a negligent violation of the rule, according to its plain and obvious meaning, nor unless such violation of the rules has been a contributing cause for his death." The specific objection is that in the use of the word "obvious" the court stated the law "too strongly" against the defendant. "Obvious" is a pretty strong-sounding word. Its chief juridic employment, so far as my observation goes, is by judges of courts of review, who generally pronounce obvious those propositions (evolved perhaps with many concealed misgivings) which they are able to support with but sparse array of precedent and which they are unwilling to put forth as an original dictum without the supporting influence of some strong, impressive, faith-bearing word—for a proposition weak in substance is oft aided in appearance by the strength of sonancy, and "obvious" is a sonant word. However, this word is not absolutely interdicted to the trial judges; and in proper cases they may use it cautiously, if the facts are sufficient to justify it. The instruction quoted above, including the obnoxious word excepted to, is taken almost verbatim from the opinion of the Supreme Court in the case of *Western & Atlantic R. Co.* v. *Bussey,* supra.

5. A female non-resident witness was examined by the plain-

tiff and excused. Later during the trial the defendant offered to prove by another witness that after she left the court-house she made a statement contradictory of a part of her testimony. Objection was made that the foundation for an impeachment had not been laid. The defendant sought to recall the witness, to lay the foundation, but she had gone. The court thereupon refused to allow proof of the contradictory statement. Impeachment of a witness by contradictory unsworn statements made out of court must be preceded by the foundation prescribed by the statute. Civil Code, §5292. The inaccessibility of the witness does not justify a departure from the rule. *Bessman* v. *Girardey,* 66 *Ga.* 18; *Raleigh R. Co.* v. *Bradshaw,* 113 *Ga.* 862, 866 (39 S. E. 555), and cit.

6. One of the assignments of error complains that the judge failed to charge the jury that if the deceased, by the exercise of ordinary care, could have avoided the consequences of the defendant's negligence, the plaintiff would not be entitled to recover. There was no written request to give this principle in charge, nor is the defense specifically asserted in the answer. The judge did charge that the plaintiff had the burden of showing that he was free from fault and that no negligence on his part contributed to the injury. This being a suit in the right of an employee against the master and the above-stated principles having been charged, and neither the pleadings nor the evidence making any express issue on the question, the failure to instruct the jury further, that if, by the use of ordinary care, the deceased could have avoided the injury the plaintiff could not recover, is not error. *L. & N. R. Co.* v. *Thompson,* 113 *Ga.* 983 (39 S. E. 483), and cit.; *G. F. & A. R. Co.* v. *Lasseter,* 122 *Ga.* 680 (4), 689 (51 S. E. 15). In *Southern Railway Co.* v. *Gore,* 128 *Ga.* 627 (58 S. E. 180), and in *S. A. L. Ry.* v. *Bostock,* 1 *Ga. App.* 189 (58 S. E. 136), it is held that if, the pleadings and evidence raise the issue as to whether the injured person, by ordinary care, could have avoided the injury, it is error for the trial judge not to instruct the jury thereon, even in the absence of a written request. See also *Atlanta Ry. Co.* v. *Gardner,* 122 *Ga.* 82 (49 S. E. 818). We have shown above that the defendant did not specifically set up this defense in its answer, and it is perfectly plain that no such defense is indicated by the evidence; for it is undisputed that instantly with the jerk of the

train the defendant fell headlong from the door of the car and was immediately run over. What a man could have done under these circumstances to have avoided the negligence of the engineer in jerking the train (after he became aware that the negligence was existent and operative) is beyond our power to conceive; for the beginning and the end of the whole casualty were included in the same twinkling of an eye.

7. Upon the measure of damages the court charged the jury as follows: "I charge you, gentlemen, in this connection, where the widow sues for damages for the death of her husband by the wrongful act of another, in estimating her pecuniary loss the jury may properly take into consideration her loss of the comfort, protection, and society of her husband, in the light of all the evidence in the case relating to the character, habits, and conduct of the husband as husband, and to the marital relations between the parties at the time of and prior to his death; and they may also consider his services in assisting her in the care of the family, if any; but the widow is not entitled to recover for her mental anxiety or distress over the death of her husband, nor for his mental or physical suffering from the injury. She is also entitled to reasonable compensation for the loss of support which her husband was legally bound to give her, based upon his probable future earnings and other acquisitions, and the station or condition in society which he would probably have occupied, according to his past history in that respect, and his reasonable expectations in the future; his earnings and acquisitions to be estimated upon the basis of the deceased's health, age, business capacity, habits, experience, energy, and his present and future prospects for business success at the time of his death, all these elements to be based upon the probable joint lives of the widow and husband. She is also entitled to compensation for loss of whatever she might reasonably have expected to have received in the way of dower or legacies from her husband's estate, in case her life expectancy be greater than his. The sum total of all these elements to be reduced to a money value, and its present worth to be given as damages. Within these limits the jury exercise a reasonable discretion as to the amount to be given, based upon the facts in evidence, and the knowledge and experience possessed by them in relation to matters of common knowledge and information." This language is taken literally from

the case of F. C. & P. R. Co. *v.* Foxworth, 41 Fla. 1 (25 So. 338, 79 Am. St. R. 149), in which the Supreme Court of Florida construed the statute which was pleaded and proved as a basis for the present action. In the case of *Savannah Ry. Co.* v. *Evans,* 121 *Ga.* 391 (49 S. E. 308), in the 7th division of the opinion (p. 399) it will be seen that the Supreme Court approved the charge given by the trial judge in an action based on this same statute. In neither the report of that case nor in the opinion is the charge excepted to set forth, but we have made an examination of the original record and find that the judge there used the same quotation from the Foxworth case as did Judge Shipp in the present instance. In addition to raising, as counsel did in the *Evans* case, the point that there was no evidence to authorize a submission to the jury as to the several elements mentioned in the instruction above, present counsel make the further contention, that if this is the law of Florida, it was not pleaded and proved to be, and the court had no power to take judicial cognizance of it; that it is contrary to the common law, which, says counsel, is presumed to exist in Florida, until the contrary appears. The Florida statute covering the transaction was pleaded and proved; so that the question whether the court could have taken cognizance of the existence of that statute is not involved. The charge complained of is merely the judicial construction placed upon the language of the statute, and if that construction be correct the charge is not erroneous. Courts in construing statutes are entitled to resort to every source from which enlightenment may be obtained. Proof of a law and interpretation of law are very different things, and are effectuated by essentially different methods. Certain aids to construction have, however, been found to be so universally valuable that they are rarely, if ever, refused recognition. One of these canons of construction is that in construing the language of a statute of a sister State, the construction placed upon it by the highest courts of that State will be adopted; so many things other, than the mere words used enter into fixing the meaning of a legislative enactment, so many things purely local are to be regarded, that any other rule would likely be productive of much error. It would be an indecent assumption for the courts of this State to pretend that they are better qualified to announce the meaning of a law enacted by the General Assembly of Florida than the courts of that State are. Interpretation is a

matter addressed solely to the intelligence, information, and learning of the judge, and he is not restricted as to the means by which he may enlarge these faculties. If a statute of a sister State is before him for construction, and he has information as to the de- cisions of that State, whether through the volumes of reports as published by authority, or from any other trustworthy source, he ought to use that information as a guide to his judgment. If ever the presumption is to be indulged that the common law pre- vails in Florida, it not being one of the original thirteen States (and the strongest current of authority is that the presumption of the existence of the common law applies only to the original thirteen States, and to States made from them), certainly such a presumption is not to prevail against proof that the legislature of that State has enacted a different rule.

8. The defendant took the testimony of its train crew by depo- sitions. These witnesses were present in the court-room during the trial. The defendant nevertheless read the depositions and did not place the witnesses on the stand. In his argument before the jury, Mr. Hawes, of counsel for plaintiff, referred to this fact and commented unfavorably on defendant's course in this respect; he also insisted on the inference that defendant's choice of method of presenting this testimony was induced by the fact that these wit- nesses "did not have the courage to come into court and face the widow of their dead comrade and swear, as they had done in their depositions, knowingly and deliberately falsely." Counsel for the defendant objected to the argument, on the ground that it was improper, and asked a ruling of the court as to the propriety of the argument. It seems from the record that the objection was no broader than the statement of it just given. The court replied: "The witnesses' manner of testifying, etc., can be considered in determining their credibility." He then read the code section em- bodying this principle (Civil Code, § 5146), and stated that so long as plaintiff's counsel kept his argument within the terms of that section of the code, the argument was legitimate. We are in doubt whether the objection is broad enough to raise any question for review. However, conceding the exception to be sufficient, we are unwilling to say that counsel exceeded the bounds of legitimate argument. He was merely discussing that which appeared in the presence of the jury as a part of the history of the trial; he lugged

in no extraneous fact; he drew inferences which may or may not have been well founded. We do not see why the manner in which a party conducts his case is not a matter of legitimate comment, even though in strict law the party has the right to conduct his case in that particular manner. For example, suppose that counsel for defendant declines to argue the case to the jury—he has a legal right to do this,—may not plaintiff's counsel point to this fact and ask the jury to infer that he knew he had a bad case? May not a party who has been compelled by sufficient circumstances to present his testimony by interrogatories, while his opponent has been able to appear and testify personally, call to the attention of the jury the disadvantage enforced on him in this respect, and ask them to weigh his testimony more liberally and that of his opponent more strictly on that account? If so, why may not one party point to the fact that the other party has voluntarily chosen to rely upon written depositions, in which the manner, etc., of the witnesses in testifying can not be observed by the jury, although the witnesses themselves are in court? The trial judge, however, should use a liberal discretion in controlling such arguments, and, if, under the particular circumstances, the line of comment is in fact unfair and illegitimate, should stop it or take other means to prevent the minds of the jury from being improperly swayed. In the present instance, although he did not rule that the argument was improper, the judge instructed the jury as follows: "There has been something said, gentlemen of the jury, during the progress of the argument of counsel, relative to some depositions that were introduced before you. I charge you, gentlemen of the jury, that the law gives to a litigant the right to take the testimony of a witness by written depositions, and to introduce these depositions in evidence in the trial of the case in which they are taken, instead of putting the witness on the stand and examining him before the jury; and this being true, no presumption of law can arise that such litigant, in exercising the privilege thus conferred upon him by law, has acted otherwise than in good faith and without any intention to suppress the truth and perpetrate a fraud on the court and jury, or upon his adversary. So, gentlemen of the jury, the bare fact that the defendant railroad company has elected in this case to introduce the depositions of some of its witnesses, instead of having them present at the trial and examining them in

open court, would not justify you in indulging against the company any unfavorable inference merely because of this circumstance."

9. Objection has been made that the court allowed counsel for the plaintiff to ask certain leading questions of the plaintiff herself while she was on the witness stand. By explanatory note the judge states that this indulgence was granted on account of a physical impediment of speech with which the witness suffered. The allowance of leading questions is a matter peculiarly within the discretion of the trial judge. I may state that my observation and experience as a practitioner leads me to believe that illiberality of trial judges in not granting this privilege in proper cases has more frequently hindered the cause of truth and justice than strictness in refusing the indulgence has ever aided it.

10. The judge charged the jury on the annuity tables, using substantially the language suggested by Mr. Justice Lumpkin in the *Burney* case, 98 *Ga.* 1 (26 S. E. 730). This related, in the case at bar, to the ascertainment of the sum which should be allowed the widow as representing the support she would have received from her husband's earnings. The objection is that in explaining to the jury how the tables might be used to reduce a sum expectant in instalments throughout future years to its present cash value, the judge employed the rate of seven per cent. in his illustrative calculations. The contention is that no rate of interest was pleaded or proved, and that under the common law (which counsel says should be presumed to be of force in Florida), no interest was allowable. If this contention were well founded it would not help the defendant; for the object of the calculation is to reduce the recovery, by requiring plaintiff to account for the interest on the present sum paid; the higher the rate of interest, the smaller the verdict. However, we think that the method of reducing the expectant future damages to a present equivalent sum should be in accordance with the rule of the forum where the damages are being assessed and estimated, even though the tort which gave rise to the cause of action was committed in another State.

11. The above disposes of all the points which we deem to be of sufficient importance to justify elaboration. We have gone through the record carefully and find no sufficient reason to set the verdict aside. It is large; but it must be remembered that the

Florida laws recognize elements in the assessment of damages in such cases which our law does not. It is to the plaintiff's good fortune, if her husband had to meet his death on the day he did, and in the way he did, that he crossed the State line just before it happened.　　　　　　　　　　　　　*Judgment affirmed.*