### 1098.   SOUTHERN RAILWAY CO. *v.* DECKER, administratrix.

1. The laws in force at the situs of a tort usually determine the civil results of its commission. In suits based on torts committed in other States, the courts of this State will enforce and will be governed by the lex loci delicti, subject to the usual exceptions recognized as being applicable in cases involving private international law.

(*a*) The courts of this State will not enforce a foreign law which is solely penal, or which contravenes the public policy of this State.

(*b*) The courts of this State, while yielding in the construction of the statutes of another State to the interpretation and effect given by the decisions of the highest courts of that State, will nevertheless determine for themselves whether the statute as construed and applied is penal, or violative of the public policy of this State.

(*c*) The statute of the State of Alabama authorizing a civil action for unlawful homicides, as construed and applied by the Supreme Court of that State, is not penal in the international sense.

(*d*) A statute is not penal in the international sense merely because it awards only punitive damages, measuring the amount by the culpability of the wrong-doer.

2. The statute of the State of Alabama authorizing a civil action for negligent homicide is not violative of the public policy of this State because the measure of damages to be awarded under it is dissimilar to the measure prescribed in like cases by the statutes of this State.

(*a*) The policy of this State tends toward the preservation of actions beyond the death of the parties; and the courts, therefore, do not hesitate to enforce the statutes of other States and foreign countries substantially similar to the English statute known as Lord Campbell's act, though the elements of damage sought to be compensated, may be variant from what is deemed adequate or just in this State.

(*b*) The courts of this State will not exclude Alabama suitors, so long as the courts of that State do not exclude Georgia suitors. Only in this sense is the expression "reciprocity is comity" applicable to causes of action springing from wrongful deaths occurring in Alabama.

(*c*) It is not competent for any foreign legislature to prescribe what laws shall be recognized and enforced in the courts of this State, even though the law as to which cognizance is sought to be excluded is a statute of the State whose legislature seeks to create the exclusion.

3. A railway company owes the duty of exercising ordinary care and diligence to a person gratuitously riding upon a train by consent of the conductor, in the absence of collusion between him and the conductor to defraud the company.

4. A writing prepared by a person and containing special provisions for his benefit will be most strongly construed against him.

5. The record is free from error.

Action for damages, from city court of Fayetteville—Judge Hollingsworth. March 9, 1908.

Argued May 8,—Decided October 26, 1908.

The defendant in error, as the administratrix of her husband, Nathan E. Decker, filed her suit for the homicide of her husband, which occurred in the State of Alabama on April 16, 1907. She obtained a verdict for $12,000; and the case comes here on exception to the overruling of a motion for new trial.

Upon the trial it appeared that on April 15, 1907, Decker made application to the Southern Railway Company for employment as a locomotive engineer. He was not employed; but a permit was granted him in the following language: "Birmingham, Ala., April 15, 1907. All Freight Engineers: The bearer, N. E. Decker, desires to enter the service of the Southern Railway Company as engineer on the Atlanta Division, and is hereby authorized to ride on freight engines for the purpose of learning the road and also the duties of an engineer, at his own risk and without expense to the company. Engineers with whom this man rides will see that. he is given all opportunity to learn the business, and if they can rec-

ommend him as a proper man for employment in this capacity, they will sign their names, and from and to what point they ride with him. This order is good for thirty days from date; if this permit is presented after the expiration of same, take it up and return same to my office, with full explanation. Yours truly, N. N. Boyden, Master Mechanic.—N. E. Decker, signature. W. R. Tomlinson, witness." Under this permit he went upon the engine of a freight-train leaving Birmingham for Atlanta, and rode on the engine until Anniston, Alabama, was reached. At that point, it having become dark and the night being rainy, the deceased left the engine, and, seeing the conductor in charge of the train, said to him, "I believe I will go back to the cab." The conductor replied, "Very good;" and under this consent the deceased went back and lay down in the cab. Just before the train reached Choccolocco, Alabama, it broke in two, without attracting the notice of the persons in charge of it. The engineer stopped the front portion of the train at the station, and a few moments later the rear cars and the cab crashed into it; and in the collision Decker's neck was broken. It is not necessary or important to recount the acts of negligence charged, or the evidence offered in proof or in disproof of them; it is sufficient to say that the jury was authorized to find that there had been a failure in ordinary care and diligence on the part of the defendant, but not that there was any wantonness or gross negligence. Further facts essential to an understanding of the points decided will be stated in the course of the opinion.

*Charlton E. Battle, Howell Hollis, Blalock & Culpepper, McDaniel, Alston & Black,* for plaintiff in error.

*Reuben R. Arnold,* contra.

POWELL, J. (After stating the foregoing facts.)

1. Initially in the case arises a question of private international law, raised by the contention of the plaintiff in error that the courts of this State will not give juridic recognition and enforcement to the Alabama statute on which this suit is based,—section 27 of the Code of Alabama, which is a mere codification of the substantial provisions of a statute enacted by the General Assembly of that State and approved February 5, 1872. As to the identity of this statute and the code section, see R. & D. R. Co. *v.* Freeman, 97 Ala. 289 (11 So. 802). This statute, as codified, pro-

vides: "A personal representative may maintain an action, and recover such damages as the jury may assess, for the wrongful act, omission, or negligence of any person or persons, or corporation, his or their servants or agents, whereby the death of his testator or intestate was caused, if the testator or intestate could have maintained an action for such wrongful act, omission, or negligence, if it had not caused death; such action shall not abate by the death of the defendant, but may be revived against his personal representative; and may be maintained though there has not been prosecution or conviction or acquittal of the defendant for such wrongful act or omission or negligence; and the damages recovered are not subject to the payment of debts or liabilities of the testator or intestate, but must be distributed according to the statute of distributions. Such action must be brought within two years from and after the death of the testator or intestate." The contention is that the courts of this State should not enforce this statute, as construed by the Alabama courts, because it is penal in its nature, and is dissimilar in character, principle, and design to any and all the laws of this State, especially in that it authorizes the assessment of punitive damages for mere negligence, without the proof of any actual damages; also because foreign statutes are enforced only through comity, and the laws of Alabama will not permit a non-resident corporation to be sued in its courts for a tort committed in another State,—that "reciprocity is comity."

The courts of this State will give to a statute of a sister State the same meaning as is given it by the courts of that State. *Georgia, Fla. & Ala. Ry. Co.* v. *Sasser,* 4 *Ga. App.* 276 (61 S. E. 506 (7*b*)). Nevertheless, the courts of this State will decide for themselves whether the statute as construed by the courts of the State of its enactment is in fact penal, in the sense that this term is used as to questions of private international law and the comities arising thereunder, or is contrary to our public policy; and to this end may disregard language employed by the local tribunals in describing the statute, or in designating the nature of the damages that are awarded thereunder. Huntington *v.* Attrill, 146 U. S. 657, 683 (36 L. ed. 1123, 13 Sup. Ct. 224) ; Evey *v.* Mexican Central R. Co., 81 Fed. 294 (38 L. R. A. 387, 393, 26 C. C. A. 407) ; Whitlow *v.* N. C. & St. L. R. Co., 114 Tenn. 344 (84 S. W. 618, 68 L. R. A. 506). The courts of nearly every civilized State or

country give force and effect to foreign laws and administer rights arising under them, not because they are compelled or bound to do so by any superior authority or by any agreement among States or nations, nor yet so much because of comity, as that word is generally used, but because justice and enlightened policy demand that they should do so. Warrender v. Warrender, 2 Cl. & Fin. 530; Minor on Conflict of Laws, §4; Wharton on Conflict of Laws (2d ed.), §§1a, 2, 3. The same primary principles which demand, as the general rule, the enforcement of foreign laws, where applicable, also raise certain exceptions. The rules and the exceptions come to the courts of this State as an inheritance from the common law, and we enforce them as such. See Wharton, supra, §1 a. See also Civil Code, §9. As exceptions to the general rule, a foreign law will not be enforced if it is penal only and relates to the punishing of public wrongs as contradistinguished from the redressing of private injuries, or if it contravenes our established public policy, or the recognized standards of civilization and good morals; and this exception on account of the contravention of public policy of the State is sometimes invoked where the foreign statute is designed to redress an injury, but prescribes a form of redress which is radically dissimilar to anything existing in our own system of jurisprudence. Wharton, supra, §4; Minor, supra, §§5, 200; Higgins v. Central Railroad, 155 Mass. 176 (29 N. E. 534, 31 Am. St. R. 544).

We shall therefore first inquire, is the statute penal? On its face it is not so; it purports to award damages, and not a penalty. It is hardly supposable that a civilized State would, for the violation of one of its penal statutes, pursue vindication even beyond the death of the lawbreaker and entail punishment upon the innocent distributees of his estate; and yet such would be the case if this statute were held to be penal; for, by its terms, "such action shall not abate by the death of the defendant, but may be revived against his personal representative." The suggestion that it is penal is prompted mainly by certain expressions that are to be found in the decisions of the Supreme Court of Alabama construing it. For example, in the case of Savannah R. Co. v. Shearer, 58 Ala. 672, which arose soon after the passage of the act in question, the court said: "Prevention of homicide is the purpose of the statute, and this it proposes to accomplish by such pe-

cuniary mulct as the jury may deem just. The damages are punitive, and they are none the less so in consequence of the direction the statute gives to the damages when recovered. They are assessed against the railroads to 'prevent homicides.'" This language is repeated and amplified in the case of L. & N. R. Co. *v.* Sullivan, decided at the same term of the court (59 Ala. 278); and in substance the same statement has been made in a number of subsequent decisions. However, we find it unnecessary to make a review of these decisions or to multiply words in attempting to display their true meaning; for the Supreme Court of Tennessee has handled this very problem with so masterful a touch that we can not do better than to quote the very language of that court at length. In the case of Whitlow *v.* N., C. & St. L. R. Co., supra, it was asserted by the original defendant that the courts of Tennessee should not enforce this Alabama statute, for substantially the same reasons here asserted; and Judge Neil, in behalf of the court, answers the contention that the statute is penal, thus: "It is true that in construing this statute, or a prior one of similar import, the Supreme Court of Alabama has held that it is not necessary to aver that the intestate left a widow, children, or next of kin (Alabama & F. R. Co. *v.* Waller, 48 Ala. 459); and that evidence of loss of services or mere pecuniary loss is immaterial and irrelevant (Richmond & D. R. Co. *v.* Freeman, 97 Ala. 289 (11 So. 800); Savannah, M. & R. Co. *v.* Shearer, 58 Ala. 672; Buckalew *v.* Tenn. Coal & Iron Co., 112 Ala. 146 (20 So. 606); Ala. G. S. R. Co. *v.* Burgess, 116 Ala. 509 (22 So. 913)); and that evidence as to age, physical and mental condition, and earning capacity, and occupation of plaintiff's testator or intestate, and that the amount of money contributed by him from his earnings to the support and maintenance of those dependent upon him, is immaterial and incompetent (Louisville & N. R. Co. *v.* Tegner, 125 Ala. 593, 28 So. 510). It is also true that the court, in several opinions (Savannah & M. R. Co. *v.* Shearer, 58 Ala. 672; South & North Ala. R. Co. *v.* Freeman, 97 Ala. 289, 11 So. 800), has referred to the damages to be assessed under the statute as a 'pecuniary mulct'—a 'punishment or fine'—against the wrong-doer, to be distributed by the administrator as personal property. Yet no one can read the foregoing authorities and other decisions of the Supreme Court of Alabama on cases arising under this stat-

ute (Tanner v. Louisville & N. R. Co., 60 Ala. 621; Memphis & C. R. v. Copeland, 61 Ala. 376; Cook v. Central R. & Bkg. Co., 67 Ala. 533; Memphis & C. R. Co. v. Womack, 84 Ala. 149 (4 So. 618); Bentley v. Georgia P. R. Co., 86 Ala. 484 (6 So. 37); Louisville & N. R. Co. v. Black, 89 Ala. 313 (4 So. 246); Leak v. Railroad Co., 90 Ala. 161 (4 So. 245); Railroad Co. v. Vaighn, 93 Ala. 209 (9 So. 468, 30 Am. St. Rep. 50); Railroad Co. v. Meadors, 95 Ala. 137 (10 So. 141); Railroad Co. v. Dobbs, 101 Ala. 219 (12 So. 770); Railroad Co. v. Martin, 117 Ala. 367 (23 So. 231); Railroad Co. v. Bush, 122 Ala. 470 (26 So. 168); Armstrong v. Street Railway Co., 123 Ala. 233 (26 So. 349); Shannon v. Jefferson County, 125 Ala. 384 (27 So. 977); Railroad Co. v. Foshee, 125 Ala. 199 (27 So. 1006); Railroad Co. v. Bryan, 125 Ala. 297 (28 So. 445); Railroad Co. v. Mitchell, 134 Ala. 261 (32 So. 735); Railroad Co. v. Hamilton, 135 Ala. 343 (33 So. 157); Railroad Co. v. Shelton, 136 Ala. 191 (34 So. 194); Railroad Co. v. Guest, 136 Ala. 348 (34 So. 968); Railroad Co. v. Crenshaw,' 136 Ala. 573 (34 So. 913); Bryant v. Railroad Co., 137 Ala. 488 (34 So. 562)), as a series, and note the questions that were stated and discussed in them, without being convinced that these cases were ordinary damage suits, brought to recover for a wrongful death inflicted by the defendant upon the intestate or testator of the plaintiff, and for the benefit of the estate of the person so killed; that the only difference, in respect of damages between these suits and others brought to recover for a wrongful death inflicted—as, for example, for the death of an employee (for cases of this character see Railroad Co. v. Bridges, 86 Ala. 449 (5 So. 864, 11 Am. St. Rep. 58); Williams v. Railroad Co., 91 Ala. 635 (9 So. 77); Railroad Co. v. Orr, 91 Ala. 548 (8 So. 360); Railroad Co. v. Mallette, 92 Ala. 209 (9 So. 363); James v. Railroad Co., 92 Ala. 231 (9 So. 335)), resides in the fact, that, while in the class of cases last referred to the jury are furnished by the court with rules of approximate certainty for measuring the damages, in cases arising under the statute sued on in the present case they are left somewhat at large, with no more certain guide than that they must consider all of the circumstances of the occurrence eventuating in the death complained of, for the purpose of ascertaining and determining the degree or extent of the negligence, if any, of the defendant, and upon such consideration they must assess damages.

to such amount or in such sum as to them may seem a just retribution for the injury in such manner inflicted, ranging from nominal damages upwards according to or proportioned to the degree of culpability; and, further, that the terms 'mulct' and 'punishment' and 'fine,' used in some of the decisions referred to, do not in these decisions bear the meaning attached to them in the domain of criminal law, and were not intended to be so understood by the Supreme Court of Alabama."

In the case of Southern Ry. Co. *v.* Bush, 122 Ala. 470 (26 So. 168), the Supreme Court of Alabama had the question before it as to whether the defendant in an action under this statute is exempt from discovery, by reason of the constitutional guarantee against compulsory process to compel any one to answer any question the answer to which would tend to incriminate him or expose him to a penalty or forfeiture; and that court decided that the defendant was not exempt from discovery, saying, among other things: "While the damages recoverable are undoubtedly, under our former rulings, punitive in their nature, and not compensatory, they are not in a strict sense a penalty; nor is the action penal or quasi criminal, within the meaning of the constitutional provisions as above construed. The statute is remedial and not penal, and was designed as well to give a right of action where none existed before as to prevent 'homicide;' and the action given is purely civil in its nature, for the redress of private, and not public wrongs." In the Freeman case, 97 Ala. 289 (11 So. 800), the statute is held to award punitive damages to the plaintiff, but not to be penal in the sense of vindicating the public justice of the State. In the case of Huntington *v.* Attrill, 146 U. S. 657 (13 Sup. Ct. 224, 36 L. ed. 1123), the Supreme Court of the United States went at length into the discussion of what were penal laws in the private international sense; and by none of the tests there enunciated is the statute before us a penal law. That the damages are punitive does not render the statute which prescribes them penal. As is said in Minor's Conflict of Laws, §198, "With respect to punitive damages, also, if the case is one for which such damages may be given in the discretion of the jury under the lex delicti, that law will govern the legal right to demand such damages in another State, unless the lex fori should expressly prohibit punitive damages, or the enforcement of the lex delicti in this respect

would contravene an established policy of the forum. This is a substantive right, not a mere matter of remedy."

2. Is the statute in question repugnant to the public policy of this State; and is the nature of the redress thereby proposed so dissimilar to our own method of remedying like wrongs that we should refuse to enforce it? Just here we find it expedient to quote a few general observations from Minor's Conflict of Laws, §200, as to causes of action arising under enactments similar to the English statute known as Lord Campbell's act, whereby wrongful injuries resulting in death are made actionable. "The view first advanced was that although the lex delicti made the tortious death actionable, it would be of no avail upon an action brought in another State, even though the death was made actionable by the lex fori also, because such statutes were to be regarded as penal, or at least as having no extraterritorial force. As more liberal ideas advanced, the next step taken by the courts was to recognize these statutes as remedial, not penal, and to permit actions to be brought in one State for a tortious death resulting in another State and actionable there, provided there was a statute substantially similar in the State of the forum. But if there were any very marked dissimilarities between the statutes of the two States, this was still taken to indicate that the enforcement of the lex delicti was contrary to the policy of the forum, and the right to sue there would be denied. The present tendency of the more recent decisions is to advance still further towards liberality, and to throw open the courts to litigants whose cause of action has arisen in other States and under the laws thereof, even though not actionable at common law or not actionable if it had arisen in the forum, provided the enforcement of the lex delicti would not seriously contravene the established policy of the forum. The presumption is in favor of the right to sue, and the burden rests upon the party objecting to show that the enforcement of the 'proper law' would be inconsistent with the domestic policy."

Of course the bringing of an action to recover for negligent homicide is not repugnant to our public policy; we have a statute authorizing it, and our courts daily award damages for that character of wrong. Civil Code, §3828. Indeed, the case of *Central R. Co.* v. *Swint*, 73 *Ga.* 651, was sustained by our Supreme Court under this same Alabama statute, and the case of *Selma, Rome &*

*Dalton R. Co.* v. *Lacy,* 43 *Ga.* 461, s. c. 49 *Ga.* 106, was based upon a prior similar enactment of that State. The *O'Shields* case, 83 *Ga.* 621 (10 S. E. 268, 6 L. R. A. 152), and the *Chaffin* case, 84 *Ga.* 519 (11 S. E. 891), related to Alabama homicides, but were controlled by another statute. Such causes of action were not maintainable at common law, not because the wrong was wholly unrecognized, but because of the maxim that "personal actions die with the person." The present declared policy of this State is to the contrary, and favors the survival of actions beyond the death of parties. Civil Code, §§ 3825, 5035.

It is difficult to persuade mankind that to kill a person wrongfully does not damage him. It is a superlative damage. Even the sanctity of a common-law maxim was not sufficient to answer the demand for some redressing of such wrongs; and England and most of the American States have passed statutes recognizing the civil quality of the injury, creating a survivorship, and prescribing remedies for the assessment of damages against the wrong-doer. These enactments vary greatly in detail—naturally so; for how shall that priceless possession, a man's life, which "consisteth not in the abundance of the things which he possesses," be valued in terms of dollars and cents? For an unlawful homicide there can be no conceivable measure of damage which is more than a speculation; not even an approximation is possible; in the broadest sense the expression "the value of a man's life" is but a figure of speech.

As the will of the lawmaking power in the respective States became fixed upon the proposition that civil damages ensue to persons wrongfully killed, and that a right of action to recover such damages should survive, it became necessary, in order to make this will effective, that legislative ingenuity should find some way of converting the quantum of the injury into denominations of dollars and cents. Adequate redress being beyond human power to give, it is not unnatural that the different intellects who come to deal with the varying phases of those subordinate injuries, of which, as the aggregate, the summum delictum of wrongful death consists, one aspect should appeal most strongly to one, another to another. In some States the legislatures specified concretely the elements of damage which appealed strongest to them; in others they made provision in general terms for the allowance of

damages and left it to the courts to work out what elements should be considered; and in this event the problem was transferred from the lawmaking power to the judicial. Some saw in the homicide the cutting off of earning capacity, and by taking the expectancy of an average man's life and the developed earning capacity of the particular person, together with such probabilities of increase or diminution therein as they thought reasonable to consider, formulated a rule of damage fairly apt for mathematical calculation, but withal very speculative in essence; for what is more uncertain than the duration of any man's life or what his earning capacity will be from time to time in the future? If the dead man's estate is to be recompensed only for the net cash loss arising through the taking away of his earning capacity, there should be made, in the calculation just referred to, a deduction of necessary living expenses, and in some States this is done. It may be seen, however, that such a deduction is not at all necessary from any consideration of justice or accuracy of calculation; for the wrong-doer deprives the victim not only of the cash increment to his estate through net earnings, but also of that very life which the living expenses would have supported; and the enjoyment of this life itself (apart from affording the necessary condition for the acquiring of net earnings) is, as ordinary humanity values such things, fully worth all its cost in necessary living expenses. Taking this view the Georgia courts—following the explicit direction of the statute, however—make no deduction on account of the necessary living expenses of the deceased. In some States (for example, Florida, though the courts there do not reach the result on the theory now about to be expressed) the jury, in assessing damages for the homicide, may take into consideration the loss of the comfort, protection, companionship and society which the deceased would have afforded his immediate family if he had lived. Though we view the action allowed by the statute purely as a survival of the action which the victim could have instituted if he were not dead, the admission of this element into the measure of damages is, nevertheless, logically permissible. The deceased may be considered as possessing, in his state of being alive, the potentialities not only of acquiring money and property through net earnings, and of enjoying a valuable thing in the mere condition of life itself, but also of giving forth something additional—companion-

ship, comfort, and protection. The potentiality for these things is his own, though others may be the necessary beneficiaries of them. The unlawful death-stroke is an invasion of his possession of these valuable potentialities. As to each and all these elements we have just been discussing, it is to be noted that the theory is that if the wrong-doer had not killed the deceased the latter would have continued to live, to labor, and to love, throughout some further period of time, definite enough of estimate to furnish a legitimate basis for calculation. But why may not the legislature or the courts, if they deem it best, accept the Calvinistic view that when a man's time has come he dies, and not otherwise; and thus say of an unlawful homicide that the victim had lived out his predestined days, and, in God's own foreordained will, had no further time allotted to him in which to live, to labor, or to love,—that the time of his death was the foredoom of God, although the death-stroke was the act of the wrong-doer? It boots not that by this doctrine neither wrong-doer nor victim could have done otherwise than they did,—the one kill and the other die; for the law may nevertheless adjudge the civil rights and say to the former, "You did a civil wrong to the deceased in killing him under the circumstances," and yet say to the latter, "Though you have suffered a civil wrong from the man who killed you, he cut off none of your actual potentialities,"—that the whole civil wrong consists in the manner of the homicide, and in the spirit in which it was committed. In other words "It is impossible but that offences will come, but woe unto him through whom they come."

This brings us to the Alabama rule: the plaintiff can not prove any so-called expectancy of the deceased as to years of life or earning capacity, nor recover for lost potentialities of companionship or comfort, etc., but may recover a sum, to be assessed by the jury, based solely upon the quality of wrongfulness in the act of the defendant which was the immediate cause of the death. The damages thus assessed are, therefore, compensatory to the deceased, not for earnings, joys, and comforts which, but for the killing, he might have enjoyed, but for the wrong of being killed in the manner and in the spirit in which his slayer acted. This is not a new view. My neighbor slaps me in the face; he really doesn't hurt me enough to make that a matter for consideration. I suffer absolutely no financial loss; but I recover heavy punitive damages, based on

the spirit in which the assailant acted. As the Alabama Supreme Court said as to this same statute, in the case of Railroad v. Freeman, 97 Ala. 289 (11 So. 802) : "It is clearly within the legislative competency, of course, to punish negligence as it is to punish wantonness, willfulness, or intentional wrong-doing. It is not controverted at all that the common-law doctrine, by which the imposition of punishment through a recovery, at the suit of an individual, of exemplary damages for wanton, wilful, or intentional misconduct is allowed, is well within organic limitations; and we conceive no basis for the distinction between the power to punish in this way for negligence and such power in respect to wantonness and the like."

The courts of this State, especially in the enforcement of private international law, will display no partiality between rival theological bases for legislative or judicial action. As Justice Lumpkin sententiously said in the case of L. & N. R. Co. v. Wilson, 123 Ga. 62 (51 S. E. 24), "Death is unique;" and we shall feel it our duty to enforce, where applicable, the varying homicide statutes of our sister States, irrespective of whether the measure of damages recognized by the lex loci delicti is superinduced by Arminian or by Calvinistic tendencies.

As to the point that the courts of this State should refuse to enforce the Alabama statute in the present case, because the courts of that State will not enforce our homicide statute under similar circumstances, we may say that we recognize no such limitation on the general rule. The saying "reciprocity is comity," quoted by counsel from the opinion in Kyle v. Montgomery, 73 Ga. 354, is of limited application, as appears from the context in which it appears. While the Civil Code, § 1817, opens the doors of the courts of this State to suitors domiciled in other States so long as the courts of those States accord our citizens the same privilege, this does not require that the courts of the sister States shall afford citizens of this State any remedy additional to what they do their own. In Alabama there is no provision for suing a non-resident corporation upon any foreign cause of action; and this applies as well to citizens of that State as to non-residents. Pullman Co. v. Harrison, 122 Ala. 149 (25 So. 697, 82 Am. St. R. 68). It may be true that the courts of Alabama do not enforce the laws of other States as broadly as we do; we have no concern with her policy in

this respect, for it can neither broaden nor limit the power of the courts of this State to give effect to what Judge Harris, in *Jackson* v. *Johnson*, 34 *Ga.* 520 (89 Am. D. 263), calls the cardinal rule,— "that the laws of every State, in force within its own limits, ought to have the same force everywhere, so far as they do not prejudice the rights of other States or of their citizens."

By a recent statute, adopted since the present suit was instituted, the legislature of Alabama has provided that suits under its homicide statutes shall be brought only within the courts of that State. See Code of Alabama (1907), §6115. Even if this statute had been in force at the time the suit was instituted, it would have been the duty of the courts of this State to disregard it. Our own sense of justice, subject to the guidance of the lawmaking power of this State, determines solely and alone what laws, domestic or foreign, we will enforce; and this discretion is subject to neither limitation nor extension by the legislature of any other State.

3. Exception is taken to an instruction to the jury, substantially, that if the deceased was riding in the cab by the consent of the conductor, the company owed him the duty of exercising ordinary care and diligence. The insistence of counsel is, that the permit quoted in the preceding statement of facts was the deceased's sole authority for being upon the train, and that it allowed him to ride only upon the engine; that when he entered the cab he was a trespasser, and not entitled to demand ordinary care and diligence from the company; that the conductor had no authority to bind the company or to create any higher duty by allowing him to ride in the train. Another exception complains of an instruction that if the deceased was riding in the cab by the consent of the conductor, the company owed him the duty of ordinary care, "without reference to the mere theoretical question as to whether he was a passenger, an employee, or a mere third person." We will discuss these two exceptions together. The permit gave the deceased no authority to ride elsewhere than upon the freight engines; this seems plain. His riding upon the cab therefore was either upon other authority or without authority. If it was without authority, he was a trespasser; if with authority, he was not a trespasser; and as the court said, irrespective of what relation he bore, he was entitled to ordinary care and diligence at the hands of the company and its servants. He had the express permission of the conductor

to ride in the cab. As to who shall ride upon railroad trains, and upon what terms, the conductor, in the absence of proof to the contrary, has the authority to decide. If he allows persons to ride upon the train, even though gratuitously, the company and its servants must use ordinary care to protect them. The following cases are more or less similar to the one at bar, and from them it is easily deducible that the deceased was not a trespasser. *Higgins v. Cherokee R. Co.,* 73 *Ga.* 149; Steamboat Co. *v.* King, 16 How. 469 (14 L. ed. 1019); Phila. R. Co. *v.* Derby, 14 How. 468 (14 L. ed. 502); Washburn *v.* Nashville R. Co., 3 Head (Tenn.), 638 (75 Am. Dec. 784); Chicago R. Co. *v.* Casey, 83 Ill. 427; Sherman *v.* R. Co., 72 Mo. 62 (37 Am. Rep. 423); Whitehead *v.* R. Co., 97 Mo. 263 (11 S. W. 751, 6 L. R. A. 409).

4. It is contended that the deceased contracted, in accepting the permit, that he would ride at his own risk. The permit in terms relates only to the risk of riding on freight engines; it does not purport to cover any other risk. He was not injured through any risk of riding on the engine. Such writings will not be extended by implication in favor of the person who issues them. As the Supreme Court said in *Georgia R. Co.* v. *Clarke,* 97 *Ga.* 707 (25 S. E. 368), "It may be fairly presumed that one who himself writes or prepares a written contract in which he is interested will be sure to use language which he conceives is best adapted to secure to himself the full benefit of everything he could claim under the agreement the writing is intended to evidence. It is therefore allowable and just, at the instance of the opposite party, to scan critically the phraseology employed." See also *R. & D. R. Co.* v. *Mitchell,* 92 *Ga.* 77 (18 S. E. 290); *W. & A. R. Co.* v. *Bussey,* 95 *Ga.* 584 (23 S. E. 207).

5. After a painstaking review of the whole record and of the exceptions preserved, we find no reversible error. The verdict is large, indeed so large in comparison with the apparent culpability of the defendant's agents that we have scanned the record very carefully to see if there was any error of the court superinducing it; but in a juridic sense we are unwilling to say that it is excessive.

*Judgment affirmed.*