NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 6, 2023

S22G0854.  MOTORSPORTS OF CONYERS, LLC et al. v. BURBACH.

PINSON, Justice.

When contracting parties choose the law of a jurisdiction other than Georgia to govern their contractual relations, Georgia courts generally honor that choice unless applying the foreign law would violate the public policy of our State. See OCGA § 1-3-9. Under this public-policy exception, our courts have for many years declined to apply foreign law to determine whether to enforce restrictive covenants—in particular, agreements not to engage in the same type of business in the same market for a period of time, usually connected with the sale of a business or employment contracts. The petitioners here—two motorcycle dealerships who seek to enforce restrictive covenants against a former employee under Florida law—

ask us to reconsider this application of the public-policy exception, citing recent changes in Georgia law that require a more flexible and permissive approach to enforcing restrictive covenants.

Having taken a fresh look, we conclude that Georgia law remains the touchstone for determining whether a given restrictive covenant is enforceable in our courts, even where the contract says another state's law applies. Our decisional law has long distinguished between restrictive covenants that are reasonable (in scope, duration, and geographic reach) and those that are unreasonable. The former are enforceable, while the latter have been classified as contracts "in general restraint of trade." For just as long, contracts in general restraint of trade have been "deemed contrary to public policy" in our State. OCGA § 13-8-2 (a) (2). As we explain below, a careful review of our decisional law and statutory history in this space shows that our legislature has codified this view, including with the recent enactment of the Georgia Restrictive Covenants Act. OCGA § 13-8-50 et seq. Although the GRCA and a corresponding constitutional amendment set up a much more

2

permissive and flexible approach to enforcing restrictive covenants, these changes did not disturb the well-settled understanding that restrictive covenants that are unreasonable under Georgia law are not just illegal, but against our public policy. This means that to determine whether applying foreign law to a restrictive covenant would violate Georgia's public policy—i.e., whether the public-policy exception to honoring a choice-of-law clause applies—a Georgia court must first determine whether the restrictive covenant complies with the GRCA. If the restrictive covenant as written is reasonable under the GRCA, the court can honor the choice-of-law provision and apply the foreign law to determine whether to enforce it. If the restrictive covenant is unreasonable under the GRCA, a Georgia court may not apply foreign law to enforce it. In that case, Georgia law would govern the contract, and so the court would apply our law, including the GRCA's blue-penciling provision, which could allow the restrictive covenant to be enforced in part.

In this case, the trial court accepted the parties' choice of Florida law to govern the employment contracts at issue without

first determining whether the restrictive covenants in the contracts complied with the GRCA. The Court of Appeals reversed, and in doing so, correctly identified application of the GRCA as the first step in the analysis of whether the public-policy exception overrides the parties' choice of foreign law. But because we have now set out a clear framework for that analysis in this opinion, we leave it for the trial court to apply that framework in the first instance. We therefore vacate the decision below and remand with direction to vacate the trial court's decision and remand for further proceedings consistent with this opinion.

1. (a) In 2016, Edmund Burbach was hired to work for a group of six Harley-Davidson dealerships under common ownership, including Motorsports of Conyers, LLC d/b/a Falcons Fury Harley-Davidson, and Motorsports of Durham, LLC d/b/a Raging Bull Harley-Davidson (collectively as to all six, "the dealerships"). Later that year, he was promoted to Chief Operating Officer, and he executed two employment agreements, one with Falcons Fury and one with Raging Bull. These agreements included identical

restrictive covenants. Among other things, those covenants prohibited Burbach, during his employment and for three years after, from accepting employment from any competitor within a 120-mile radius of any of the six dealerships. Both agreements also included a choice-of-law provision stating that the agreements were to be governed by Florida law.

Burbach's employment with the dealerships ended in December 2019. He then began working for Preston Cycles West, LLC d/b/a Thunder Tower West Harley-Davidson, a competitor of the dealerships located less than 20 miles from Falcons Fury. Falcons Fury and Raging Bull (together, "Motorsports") asked him to stop that work, which they claimed violated the restrictive covenants in his employment agreements. He persisted, so they sued him in the Superior Court of Henry County to enforce the restrictive covenants. Motorsports then moved for an interlocutory injunction.

(b)  After a hearing, the trial court issued an interlocutory injunction. Relevant here, the court applied Florida law to determine whether the restrictive covenants were enforceable.  In

5

doing so, the court rejected Burbach's argument that, notwithstanding the agreements' choice-of-law provisions, Georgia law should apply because Florida law governing restrictive covenants violates Georgia public policy. In support, the court relied on *Auld v. Forbes*, 309 Ga. 893 (848 SE2d 876) (2020). In that wrongful-death case, this Court examined the "public policy exception" to the doctrine of lex loci delicti—which requires courts to apply the law of the jurisdiction where the tort was committed—and held that a court may decline to apply another state's law "only if the out-of-state law is so 'radically dissimilar to anything existing in our own system of jurisprudence' that it would 'seriously contravene' the policy embodied in Georgia law." 309 Ga. at 896 (2) (b) (citation omitted). Applying *Auld*, the trial court compared Florida's restrictive-covenants statute with the Georgia Restrictive Covenants Act and determined that Florida's law was not "so radically dissimilar to" Georgia's that public policy required it to apply Georgia law instead. Id. at 898 (2) (b). So the court applied Florida law, and it determined that the restrictive covenants were

6

enforceable because they were "reasonable and necessary to protect [Appellants'] legitimate business interests." The court held further that Motorsports had met their burden to justify interlocutory injunctive relief. The court therefore granted an interlocutory injunction that barred Burbach from working in any capacity for any competitor located within 120 miles of either Falcons Fury or Raging Bull.

(c) The Court of Appeals reversed. *Burbach v. Motorsports of Conyers, LLC*, 363 Ga. App. 188 (871 SE2d 63) (2022). The court reasoned that it would "apply Georgia law to determine the enforceability of the forum-selection clause here" because "forum selection clauses involve procedural and not substantive rights." Id. at 190 (1) (citation and punctuation omitted).[1] And under Georgia

---

[1] Throughout its opinion, the Court of Appeals used the terms "forum-selection clause" and "choice-of-law clause" interchangeably, but these are different kinds of contract provisions. Forum-selection clauses operate to give "advance consent to personal jurisdiction" in a particular forum. JOHN K. LARKINS, GA. CONTRACTS: LAW AND LITIGATION, § 1:10 (2d ed. Sept. 2022). Choice-of-law clauses identify the substantive law that the parties have chosen to govern the contract. Id. at § 1:9. No one disputes that the contractual provisions at issue here, which say that the agreements are "governed by, and construed in accordance with, the laws of the State of Florida applicable to

law, the court explained, a showing that "a restrictive covenant violates Georgia public policy and that a court in the selected forum likely would find the restrictive covenant enforceable" is a "compelling reason" to "avoid the contractual forum selection clause." Id. at 190-191 (1) (punctuation omitted). The court then cited the GRCA's directive that "a court shall not enforce a restrictive covenant unless it is in compliance with [the Act]," under which restrictive covenants must be "reasonable in time, geographic area, and scope of prohibited activities." Id. at 191 (1) (quoting OCGA §§ 13-8-53 (a), 13-8-54 (b)). In a footnote, the court distinguished *Auld* because that case involved "a tort that occurred in another country," while this case was about a "contractual dispute [involving] a mutually negotiated, forum-selection clause." Id. at 191 (1) n.5.

The Court of Appeals then turned to the restrictive covenants here and concluded they would be "unreasonable" under Georgia law

---

contracts executed in and to be performed in that State," are choice-of-law clauses.

because they were too broad in their duration, scope of activity, and geographic reach. *Burbach*, 363 Ga. App. at 191-192 (1). On the other hand, the court believed the covenants would be enforceable under Florida law, see id. at 192-193 (1). Based on that review, the court concluded that "the trial court erred in upholding the [choice-of-law] clauses in Burbach's restrictive covenants." Id. at 193 (1).

We granted review to clarify the framework for deciding whether to apply contracting parties' choice of foreign law to govern the enforceability of a restrictive covenant in an employment contract.

2. (a) As a general rule, when parties agree to have foreign law govern their contractual relations, Georgia courts must honor that choice and apply the foreign law as a matter of comity. See OCGA § 1-3-9; *CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc.*, 283 Ga. 426, 428 (659 SE2d 359) (2008); *Carr v. Kupfer*, 250 Ga. 106, 107 (1) (296 SE2d 560) (1982). But the statute that provides this general rule also sets out exceptions to it: notwithstanding any agreement of the contracting parties, courts may not apply foreign law to

9

interpret or enforce a contract if that course is "restrained by the General Assembly" or "contrary to the policy or prejudicial to the interests of this state." OCGA § 1-3-9.[2] In other words, contractual choice-of-law provisions "will be enforced unless application of the chosen law would be contrary to the public policy or prejudicial to the interests of this state." *CS-Lakeview*, 283 Ga. at 428. See also *Convergys Corp. v. Keener*, 276 Ga. 808, 809 (582 SE2d 84) (2003) (declining invitation to "enforce contractual rights which contravene the policy of Georgia"); *Nasco, Inc. v. Gimbert*, 239 Ga. 675, 676 (2) (238 SE2d 368) (1977) ("The law of the jurisdiction chosen by parties to a contract to govern their contractual rights will not be applied by Georgia courts where application of the chosen law would contravene the policy of, or would be prejudicial to the interests of,

---

[2] In full, OCGA § 1-3-9 provides

The laws of other states and foreign nations shall have no force and effect of themselves within this state further than is provided by the Constitution of the United States and is recognized by the comity of states. The courts shall enforce this comity, unless restrained by the General Assembly, so long as its enforcement is not contrary to the policy or prejudicial to the interests of this state.

10

this state."); *Carr*, 250 Ga. at 107 (1) (choice-of-law clauses will ordinarily be enforced "[a]bsent a contrary public policy"); *Ulman, Magill & Jordan Woolen Co. v. Magill* 155 Ga. 555, 557 (117 SE 657) (1923) ("Comity of the States . . . will be enforced, unless restrained by the General Assembly, so long as its enforcement is not contrary to the policy or prejudicial to the interests of this state." (cleaned up)).

Litigants may try to show that applying foreign law would be contrary to Georgia's public policy—and that a court should therefore disregard a contractual choice-of-law clause—by showing that the foreign law governing the issue is significantly different from any corresponding Georgia law. In such cases, we have explained that "mere dissimilarit[ies]" between the foreign law and ours are not enough to disregard the parties' choice of law, because differences alone "do[ ] not mean that the foreign state's law necessarily is against the public policy of the forum state." *CS-Lakeview*, 283 Ga. at 428 (citations and punctuation omitted). Instead, as we clarified in *Auld*, if a party seeks to disregard the

11

choice of foreign law based on its dissimilarities to our own, it must show that the foreign law is "so 'radically dissimilar to anything existing in our own system of jurisprudence' that it would 'seriously contravene' the policy embodied in Georgia law." 309 Ga. at 896 (2) (b) (quoting *Southern R. Co. v. Decker*, 5 Ga. App. 21, 25 (1), 29 (2) (62 SE 678) (1908)).

(b) But no such comparison-based inquiry is necessary in the context of restrictive covenants. In this context, Georgia public policy is instead set by statute. OCGA § 13-8-2 (a) expressly deems certain kinds of contracts "contrary to public policy" and declares that such contracts "cannot be enforced." Among the contracts deemed contrary to public policy are "[c]ontracts in general restraint of trade, as distinguished from contracts which restrict certain competitive activities, as provided in Article 4 of this chapter." Id. at (a) (2). And "Article 4 of this chapter" is the GRCA, which sets out a comprehensive scheme that governs whether restrictive covenants in certain kinds of contracts are enforceable. See generally OCGA §

13-8-50 et seq.[3] So, by statute, "contracts in general restraint of trade" are against public policy and unenforceable, while "contracts which restrict certain competitive activities, as provided in [the GRCA]," are not. OCGA § 13-8-2 (a) (2).

This category of contracts "in general restraint of trade" includes unreasonable restrictive covenants. The principle that "contracts in general restraint of trade" are contrary to public policy has its roots in English common law, see *Holmes v. Martin*, 10 Ga. 503, 505 (1) (1851), and it has been a part of our Code, in materially the same form, since at least 1868. See OCGA § 13-8-2 (a) (2) (prohibiting "contracts in general restraint of trade"); Code Ann. 1933, § 20-504 (same); Code Ann. 1910, § 4253 (prohibiting "contracts in general in restraint of trade"); Code Ann. 1895, § 3668 (same); Code Ann. 1882, § 2750 (same); Irvin's Code 2d. ed. 1873, §

---

[3] In particular, see OCGA §§ 13-8-52 (a) (listing specific types of contracts, including employment contracts, to which GRCA applies); 13-8-53 (a) (providing that restrictions that are "reasonable in time, geographic area, and scope of prohibited activities" "shall be permitted"); and 13-8-53 (c), 13-8-56, and 13-8-57 (establishing parameters for "reasonableness" of restrictive covenants).

2750 (same); Irvin's Rev. Code 1868, § 2708 (same).[4] Over that span,

decisions applying this principle to restrictive covenants have

consistently explained that if such covenants are unreasonable—in

scope, duration, or geographic reach—they are "void" or

"unenforceable" contracts "in general restraint of trade." See, e.g.,

*Moore v. Dwoskin, Inc.*, 226 Ga. 835, 836-837 (1) (177 SE2d 708)

(1970) (restrictive covenant prohibiting employee from engaging in

employer's business in "the primary business areas of 31 states" for

two years following employment was "unreasonable . . . and opposed

to the interests of the public," and thus void); *Aladdin, Inc. v.*

*Krasnoff*, 214 Ga. 519, 520 (2) (105 SE2d 730) (1958) (restrictive

---

[4] This principle is part of our State Constitution as well. Article III, Section VI, Paragraph V (c) (1) of the Georgia Constitution of 1983 prohibits the General Assembly from "authoriz[ing] any contract or agreement which may have the effect of or which is intended to have the effect of defeating or lessening competition." In construing the materially similar predecessors of this provision in earlier constitutions, we have held that it "mean[s] precisely the same thing which the Code section [prohibiting contracts in general restraint of trade] has been construed to mean." *Griffin v. Vandegriff*, 205 Ga. 288, 293 (1) (53 SE2d 345) (1949) (construing Article IV, Section IV, Paragraph I of the Georgia Constitution of 1945). Accord *Howard Schultz & Assocs. v. Broniec*, 239 Ga. 181, 183 (1) (236 SE2d 265) (1977) ("By both constitutional and legislative provision, Georgia prohibits contracts or agreements in general restraint of trade.").

covenant that prohibited disclosure of "all of the employer's past, present, and potential customers," which was "unlimited as to either time or territory," was "an attempt at general restraint of trade" and thus "unenforceable"); *Orkin Exterminating Co. of South Ga. v. Dewberry*, 204 Ga. 794, 802, 807 (1) (51 SE2d 669) (1949) ("A contract in restraint of trade is thus total and general, when by it a party binds himself not to carry on his trade or business at all." (citation and punctuation omitted)), overruled in part on other grounds by *Barry v. Stanco Commc'ns Prods., Inc.*, 243 Ga. 68, 71 (3) (252 SE2d 491) (1979); *Bonner v. Bailey*, 152 Ga. 629, 632 (110 SE 875) (1922) (in assessing whether to enforce a restrictive covenant, explaining that "it is settled in this state that a contract in general restraint of trade without territorial limitation is contrary to public policy and unenforceable").

On the other hand, restrictive covenants that are "reasonably limited" in scope, duration, and geographic reach—also referred to as contracts in "partial restraint of trade"—have consistently been held to be enforceable. As we explained more than 170 years ago,

15

the distinction was early taken, and is established by an unbroken current of authority, English and American, between [restrictive covenants] as are in general restraint of trade, and such as are in restraint of it only as to particular places and persons, or for a limited time. The latter, if founded upon a good and valuable consideration, are valid, while the former are universally prohibited.

*Holmes*, 10 Ga. at 505 (1). See also *Griffin v. Vandegriff*, 205 Ga. 288, 294 (1) (53 SE2d 345) (1949) ("Numerous decisions of this court, applying the [predecessor to OCGA § 13-8-2 (a) (2)] have held that such contracts when reasonable as to time and area of restrictions are not void under that section."). The takeaway is that in Georgia, the line between unreasonable restrictive covenants and reasonable ones has long been drawn by public policy: unreasonable restrictive covenants are contracts in general restraint of trade that are against public policy, while reasonable restrictive covenants are valid and enforceable. See *W.R. Grace & Co. v. Mouyal*, 262 Ga. 464, 465 (1) (422 SE2d 529) (1992); *Moore*, 226 Ga. at 836-837 (1); *Aladdin*, 214 Ga. at 520 (1); *Orkin*, 204 Ga. at 802 (1); *Black v. Horowitz*, 203 Ga. 294, 294 (1) (46 SE2d 346) (1948). See also *Hood v. Legg*, 160 Ga. 620, 627-628 (128 SE 891) (1925) (explaining that in assessing

16

whether restrictive covenants are reasonable and thus enforceable, "what is meant by the word 'reasonable'" is "whether the contract unduly burdens the public interest," and so "public policy is the test"); *Rakestraw v. Lanier*, 104 Ga. 188, 197 (30 SE 735) (1898) (in considering reasonableness of restrictive covenant, noting that "[w]hile public policy forbids any agreement which unreasonably restrains a person from exercising his trade or business, it is equally true that public policy also requires that the freedom of persons to enter into contracts shall not be lightly interfered with"); *Holmes*, 10 Ga. at 505 (2) ("The reason assigned for this difference is, that all general restraints tend to promote monopolies and to discourage industry and enterprise and just competition; whereas the same reason does not apply to special restraints. On the contrary, it may even be beneficial to the public, that a particular place should not be overstocked with persons engaged in the same business.").

(c) This settled understanding that unreasonable restrictive covenants are contracts in general restraint of trade—and thus against public policy—has been confirmed by recent legislation in

17

the restrictive-covenant space.

(i) For a long time, the standards governing the validity of restrictive covenants developed through the decisional law discussed above, which had for years grappled with how to distinguish reasonable restrictive covenants from unenforceable contracts in general restraint of trade. See *W.R. Grace & Co.*, 262 Ga. at 465 (1) (noting the "three-element test" that courts had developed "as a 'helpful tool' in examining the reasonableness" of restrictive covenants (citation omitted)). In 1990, the General Assembly for the first time codified standards for assessing whether restrictive covenants are reasonable and thus enforceable. In that Code section, the legislature approved the enforcement of "contracts in partial restraint of trade"—defined as "[c]ontracts that restrain in a reasonable manner any party thereto from exercising any trade, business, or employment." Former OCGA § 13-8-2.1 (a), enacted at Ga. L. 1990, pp. 1676-1677, § 2. In the same legislation, OCGA § 13-8-2 (a) (2) was amended to distinguish such "contracts in partial restraint of trade" from those in general restraint of trade, which

remained "contrary to public policy." See former OCGA § 13-8-2 (a) (2), as amended by Ga. L. 1990, p. 1676, § 1. In doing so, the General Assembly adopted the longstanding public-policy-based distinction in our decisional law between unenforceable contracts in general restraint of trade and reasonable restrictive covenants. See *Peachtree-Cain Co. v. McBee*, 254 Ga. 91, 93 (1) (327 SE2d 188) (1985) (noting that "when a statute is codified from . . . decision[s] of this court, unless the language of the [statute] imperatively requires a different construction, it will be presumed that the General Assembly in adopting it intended merely to adopt the principle of law announced in the decision[s] from which it is taken" (citation and punctuation omitted)). See also *Crum v. Jackson Natl. Life Ins. Co.*, 315 Ga. 67, 77 (2) (c) (ii) (880 SE2d 205) (2022) ("we presume that the legislature enacted the new statute 'with full knowledge of' the extant body of decisional law").

Soon after its enactment, OCGA § 13-8-2.1 was declared unconstitutional because its provision allowing for the "partial enforcement" of unreasonable restrictive covenants (i.e., blue

19

penciling) would have "breathe[d] life into" contracts that "[had] the effect of defeating or lessening competition," in violation of Article III, Sec. VI, Par. V (c) of the 1983 Georgia Constitution. See *Jackson & Coker, Inc. v. Hart*, 261 Ga. 371, 372 (1) (405 SE2d 253) (1991). But nothing in *Jackson* disturbed the conceptual distinction between general and partial restraints of trade (i.e., reasonable restrictive covenants) or the understanding that unreasonable restrictive covenants were contracts in general restraint of trade.

(ii) When the General Assembly enacted the GRCA some 20 years later—after the ratification of a constitutional amendment to address the issue identified in *Jackson*[5]—it carried forward the settled understanding that unreasonable restrictive covenants are general restraints of trade that contravene public policy. Ga. L. 2011, p. 399, 400, § 2 (repealing prior OCGA § 13-8-2 (a) (2) and reenacting it in its current form). Through the GRCA, the General

---

[5] See Ga. L. 2011, p. 399, 399-400, § 1 (detailing legislative history of GRCA, including constitutional amendment); Ga. Const. of 1983, Art. III, Sec. VI, Par. V (c) (as amended Nov. 2, 2010) (authorizing "judicial enforcement" of certain "contracts or agreements restricting or regulating competitive activities" and expressly allowing blue-penciling).

20

Assembly set up a comprehensive scheme for determining whether restrictive covenants are reasonable and thus enforceable. See OCGA §§ 13-8-53 (a), (c), 13-8-56, 13-8-57 (together, providing that reasonable restrictive covenants are enforceable and establishing standards for determining whether a given covenant is reasonable); 13-8-55 (setting pleading and burden of proof requirements). In several ways, that scheme reflects a more permissive and flexible approach to restrictive covenants compared to what had developed through our decisional law. See *Burson v. Milton Hall Surgical Assocs., LLC*, 343 Ga. App. 159, 161 (806 SE2d 239) (2017) (noting that prior to the enactment of the GRCA, "'Georgia law disfavored restrictive covenants'" (citation omitted)). For example, the GRCA tells courts to construe restrictive covenants "in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." OCGA § 13-8-54 (a). And, as now authorized by the 2010 constitutional amendment, it expressly allows blue-penciling: if a court concludes that a restrictive covenant violates the GRCA as written, the court "may

21

modify the restraint provision and grant only the relief reasonably necessary" to protect the proponent's legitimate business interests and to "achieve the original intent of the contracting parties." OCGA § 13-8-54 (b). See also OCGA § 13-8-53 (d). Compare *Coleman v. Retina Consultants, P.C.*, 286 Ga. 317, 320 (1) (687 SE2d 457) (2009) (before GRCA, noting that Georgia courts generally did not blue-pencil overly broad restrictive covenants). This more permissive approach is grounded in the General Assembly's express finding that "reasonable restrictive covenants . . . serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state." OCGA § 13-8-50.

But the GRCA's more permissive scheme for construing and enforcing restrictive covenants still preserved the settled understanding that restrictive covenants that are unreasonable—i.e., those which do *not* comply with the GRCA—are against public policy. Under the GRCA, such restrictive covenants are not only

"unlawful" but "void and unenforceable." OCGA § 13-8-53 (d). See also OCGA § 13-8-54 (b) ("In any action concerning enforcement of a restrictive covenant, a court shall not enforce a restrictive covenant unless it is in compliance with the provisions of Code Section 13-8-53."). That language is the same kind of language used in our decisional law to describe the effect of concluding that a restrictive covenant was against public policy. See, e.g., *W.R. Grace*, 262 Ga. at 465 (1) (unreasonable restrictive covenants are "void"); *Moore*, 226 Ga. at 836-837 (1) (same); *Aladdin*, 214 Ga. at 520 (2) (unreasonable restrictive covenant was "unenforceable"). And more important, the GRCA maintained the public-policy-based line our decisional law has drawn between contracts in general restraint of trade and reasonable restrictive covenants: revised OCGA § 13-8-2 (a) (2) distinguishes between "[c]ontracts in general restraint of trade," which remain "contrary to public policy," and "contracts which restrict certain competitive activities, as provided in [the GRCA]." This latter language swaps out the "partial restraint of trade" label our decisional law (and the short-lived OCGA § 13-8-2.1) gave to

23

reasonable restrictive covenants in favor of the GRCA and its standards for determining whether a given restrictive covenant is reasonable. And the juxtaposition of that language against the "general restraint of trade" language—which our decisional law has long used interchangeably with unreasonable restrictive covenants—is hard to understand as anything other than re-adoption of the settled understanding that unreasonable restrictive covenants are against public policy.

(e) What does this mean for the choice-of-law question before us? Put simply, it means that the inquiry must start with Georgia law. As discussed above, under OCGA § 1-3-9, Georgia courts may not enforce foreign law if it would contravene our public policy. And as we have just explained, restrictive covenants that do not comply with the GRCA are contrary to public policy. So a Georgia court that is asked to apply foreign law to determine whether to enforce a restrictive covenant must first apply the GRCA to determine whether the restrictive covenant complies with it. This includes an analysis of whether the restrictions at issue are "reasonable in time,

24

geographic area, and scope." OCGA § 13-8-53 (a). If the court applies the GRCA and concludes that the restrictive covenant is reasonable, the court can honor the choice-of-law provision and apply the foreign law to determine the enforceability of the restrictive covenant. If, on the other hand, applying the GRCA shows that the restrictive covenant is unreasonable, the restrictive covenant is against public policy, see OCGA § 13-8-2 (a) (2), and the court may not apply foreign law to enforce it, see OCGA § 1-3-9. Instead, the court must apply Georgia law, which would not allow for the enforcement of the unreasonable restrictive covenant as written. That said, the court would have the power under Georgia law to partially enforce the covenant through blue-penciling—"modify[ing]" the covenant and "grant[ing] only the relief reasonably necessary" to protect legitimate business interests and achieve the parties' intent "to the extent possible." OCGA § 13-8-54 (b); see also OCGA § 13-8-53 (d).[6]

---

[6] The Court of Appeals' opinion can be read to suggest that Georgia courts may simply decline to blue-pencil an unreasonable restrictive covenant without reason. See *Burbach,* 363 Ga. App. at 192 (1) n.8 ("Although Georgia courts may apply the "'blue pencil'" doctrine and modify unreasonable

Our conclusion that Georgia courts may not apply foreign law to enforce a restrictive covenant that would be deemed unreasonable under Georgia law largely tracks our courts' approach before the GRCA and the corresponding constitutional amendment were in force. See *Convergys Corp.*, 276 Ga. at 808-809 (declaring, in regard to certified question on whether Ohio law should govern the noncompetition agreement at issue, that "we continue to refuse to enforce contractual rights which contravene the policy of Georgia"); *Nasco, Inc.*, 239 Ga. at 676-677 (2) (noting that "[c]ovenants against disclosure, like covenants against competition, affect the interests of

---

restrictive covenants, Georgia courts are not required to do so.") (citing OCGA § 13-8-54 (b) ("[T]he court *may* modify the restraint provision." (emphasis added by the Court of Appeals)))). To be sure, this provision's use of the word "may" indicates that the court may exercise discretion to determine whether or not to blue-pencil an agreement. See *Belt Power, LLC v. Reed*, 354 Ga. App. 289, 294-295 (2) (b) (840 SE2d 765) (2020). That said, the same statute that empowers a court to blue-pencil a restrictive covenant also *requires* a court to construe restrictive covenants "to comport with the reasonable intent and expectations of the parties" and "in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." OCGA § 13-8-54 (a). And the blue-penciling provision empowers a court to modify a restrictive covenant for precisely those purposes. See OCGA § 13-8-54 (b). Given this language, it is not obvious to us that a trial court's discretion to blue-pencil or not is wholly unbounded. That said, we leave for another day any questions about the breadth of a trial court's discretion to decide whether to blue-pencil a restrictive covenant under this provision.

this state, . . . and hence their validity is determined by the public policy of this state," and thus applying Georgia law rather than that of selected state to conclude that restrictive covenants were invalid); *Hostetler v. Answerthink, Inc.*, 267 Ga. App. 325, 328 (b) (599 SE2d 271) (2004) ("A choice of law provision set forth in an agreement containing a restrictive covenant will not allow the parties to choose a jurisdiction that will uphold what is against Georgia public policy; Georgia courts will decide the validity of such restrictive covenant in partial restraint of trade under Georgia law."). Motorsports suggests that those decisions were grounded in a pre-GRCA "hostility" to restrictive covenants and thus were effectively abrogated when the GRCA was enacted. It is not clear to us that they are right on that point, but even assuming they are, it is of no moment: as we have explained, our conclusion here is grounded in statutes currently in force, including OCGA § 13-8-2 and the GRCA. The enactment of the GRCA and its enabling constitutional amendment may have liberalized our State's general approach to restrictive covenants, but as we have shown above, the legislature

retained the consistent and longstanding view that unreasonable restrictive covenants are against public policy and may not be enforced by Georgia courts. See OCGA §§ 13-8-53 (a), (d); id. § 13-8-54 (b). And the GRCA certainly did not change our State's longstanding and codified policy of declining to apply foreign law to enforce contracts against the public policy of our State. See OCGA § 1-3-9; *Convergys Corp.*, 276 Ga. at 809; *Ulman, Magill & Jordan Woolen Co.*, 155 Ga. at 557-558. In other words, although the GRCA implemented an approach to restrictive covenants that is more flexible in some ways, that new flexibility still does not include allowing Georgia courts to enforce restrictive covenants that are deemed unreasonable under Georgia law.

3. Having now clarified the standard for determining whether to apply contracting parties' choice of foreign law to govern the enforceability of a restrictive covenant in an employment contract, we vacate the judgment below and remand this case to the Court of Appeals. On remand, the Court of Appeals is directed to vacate the judgment of the trial court and remand the case to that court, so that

28

it may in the first instance apply the framework set out above. To do that, the trial court must first apply the GRCA to determine whether the restrictive covenants in Burbach's employment agreements comply with it. If the covenants are reasonable under Georgia law, see OCGA § 13-8-53, the court must then apply the parties' chosen law—Florida law—to determine their ultimate enforceability.[7] If the covenants as written do not comply with the GRCA, then enforcing them would violate Georgia public policy, and so the court may not apply foreign law to enforce them. Instead, Georgia law would govern the covenants, and so the trial court would apply our law, including the GRCA's blue-penciling provision, to determine whether the restrictive covenants may be enforced in part.

*Judgment vacated and case remanded with direction. All the Justices concur.*

---

[7] We do not decide here whether, and under what circumstances, a Georgia court could decline to apply the parties' choice of foreign law if that law would *invalidate* a restrictive covenant that would be enforceable under Georgia law.